[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 09-12685
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 26, 2010
JOHN LEY
CLERK

D. C. Docket No. 08-21136-CR-JLK

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RICKY WRIGHT,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(May 26, 2010)

Before PRYOR and FAY, Circuit Judges, and QUIST,* District Judge.

FAY, Circuit Judge:

Ricky Wright appeals his conviction and eighty-four month sentence for

knowingly possessing a firearm and ammunition that affected interstate commerce

_____
* Honorable Gordon J. Quist, United States District Judge for the Western District of
Michigan, sitting by designation.

after having been convicted of a felony. Wright presents a case of first impression as to whether section 4A1.2(k) of the United States Sentencing Guidelines applies to Florida's community control program. Wright also challenges the constitutionality of his conviction by alleging that Congress exceeded its authority in passing the law under the Commerce Clause. After careful consideration, we find that section 4A1.2(k) applies to Florida's community control program. We also find that Wright's conviction is constitutionally sound. Accordingly, Wright has presented no reversible error and we affirm the decision of the district court.

## I. FACTS

A federal grand jury indicted Ricky Wright on two counts of knowingly possessing a firearm and ammunition that affected interstate commerce after having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1).[1] Wright initially pled not guilty, but later changed his plea and pled guilty to one count of the indictment in exchange for dismissal of the second count.

During the plea hearing, the government proffered the following facts without objection: A confidential source working with the ATF and DEA

---

[1] "It shall be unlawful for any person– (1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year; . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922 (g).

contacted Wright and discussed purchasing a firearm from him.[2]  Later that day, the source met with Wright and another male in Miami, Florida.  At that time, the source purchased a nine millimeter pistol from the second male for $450.00.  The purchase took place in Wright's presence and at his direction.  Four days later, the source again contacted Wright and discussed purchasing another firearm from him.  Wright sent his girlfriend to sell a .40 caliber handgun and a magazine with ammunition to the confidential informant in exchange for $2,840.00.  At the time of both transactions, Wright had been convicted of multiple felonies.  A record check of both firearms revealed that they had been manufactured outside of Florida.

Before sentencing, Wright challenged the Presentence Investigation Report's calculation of his criminal history under the United States Sentencing Guidelines.  Wright's relevant criminal history is undisputed.  Wright pled guilty to conspiracy to commit armed robbery and was sentenced to 120 days in county jail, followed by two years community control and three years probation.  After serving his jail time, Wright was released from custody and his community control period commenced.  Wright subsequently violated the terms of his community control by missing curfew on three separate occasions.  As a result, Wright's community

---

[2] "ATF" refers to the Bureau of Alcohol, Tobacco, Firearms and Explosives.  "DEA" is the Drug Enforcement Administration.

control was revoked and he was sentenced to 366 days in state prison.

Under the Guidelines, three criminal history points are assessed for a prior sentence of imprisonment exceeding one year and one month. *See* U.S.S.G. § 4A1.1(a). Whereas only two criminal history points are assessed if the prior sentence is between sixty days and thirteen months. *See* U.S.S.G. § 4A1.1(b). In determining the applicable length of a sentence, the Guidelines state: "In the cases of a prior revocation of probation, parole, supervised release, special parole, or mandatory release, add the original term of imprisonment to any term of imprisonment imposed upon revocation. The resulting total is used to compute the criminal history points for § 4A1.1(a),(b), or (c), as applicable." U.S.S.G. § 4A1.2(k)(1).

The district court held that revocation of community control was governed by § 4A1.2(k) and added the 366-day sentence to the original 120-day sentence. This calculation pushed Wright past the thirteen month threshold that carried the additional criminal history point, resulting in an advisory sentencing range of 84-105 months instead of 70-87 months. Finding that a sentence at the low end of the guideline range was reasonable, the district court sentenced Wright to eighty-four months in prison.

Wright now appeals the determination that revocation of community control

4

is governed by § 4A1.2(k) and seeks a re-calculation of his criminal history. Wright does not dispute that he violated the terms of his community control. He concedes that the only question is whether community control qualifies as a form of supervision covered by § 4A1.2(k).

## II. DISCUSSION

### A.  U.S.S.G. § 4A1.2(k)

We review "a district court's interpretation of the Guidelines *de novo* and its factual findings for clear error." *United States v. Valnor*, 451 F.3d 744, 750 (11th Cir. 2006).   Wright argues that the district court erred in finding that revocation of community control falls under § 4A1.2(k)(2)(B), which covers the revocation of "probation, parole, supervised release, special parole, or mandatory release."[3] Specifically, Wright argues that since community control is not an enumerated form of supervision under § 4A1.2(k)(2)(B), the period of imprisonment associated with his violation of community control should not count towards his criminal history.  As such, Wright asserts that the district court should have assessed him two criminal history points based on his initial 120-day sentence instead of the three criminal history points derived from adding the 120-day and 366-day

---

[3] The district court only referenced the general provision, § 4A1.2(k), in making its determination.  It is unclear why Wright cites § 4A1.2(k)(2)(B), which alters the time constraints for calculating criminal history based upon the revocation of the enumerated sentences.  Wright provides no discussion about how the time constraint would impact our findings.

5

sentences together. If Wright prevails, his corresponding Guideline range would be 70-87 months instead of 84-105 months.

In support of his point, Wright contends that the language of the Guidelines should be given its plain and ordinary meaning. *See United States v. Tham*, 118 F.3d 1501, 1506 (11th Cir. 1997). Wright asserts that the rule of lenity supports his argument, contending that, "[t]he policy of lenity means that the Court will not interpret a federal criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what Congress intended." *Ladner v. United States*, 358 U.S. 169, 178, 79 S. Ct 209, 214 (1958). Wright argues that the rule of lenity applies to the Sentencing Guidelines. *See United States v. Jeter*, 329 F.3d 1229, 1230 (11th Cir. 2003) (per curiam).

The government responds that the district court properly calculated Wright's criminal history. The government argues that the commentary to U.S.S.G. §§ 4A1.1 and 4A1.2 indicates that the forms of supervision listed are not exhaustive; therefore, sentences imposed upon revocation for other forms of supervision are counted. The government also argues that the rule of lenity is inapplicable in this case because the Sentencing Commission's intent is clear. *See United States v. Camacho-Ibarquen*, 410 F.3d 1307, 1315 (11th Cir. 2005).

6

This court has not squarely decided the issue of whether the imposition of a sentence after a defendant violates the terms of his community control results in the application of § 4A1.2(k). Wright is correct that the Guidelines do not use the term community control. However, the comments to § 4A1.1 state that § 4A1.2(k) applies to "revocation of probation, parole, *or a similar form of release*." U.S.S.G. § 4A1.1, cmt. n.1 (emphasis added). Similarly, application note 11 explains that § 4A1.2(k) "covers revocations of probation *and other conditional sentences*." U.S.S.G. § 4A1.2, cmt. n.11 (emphasis added).

"[C]ommentary in the Guidelines Manuel that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S. 36, 38, 113 S. Ct. 1913, 1915 (1993). Wright has not asserted that the Guidelines or their commentary violate the Constitution or any federal statute. At oral argument, Wright's counsel argued for the first time that the commentary simply refers back to the finite list of five types of release enumerated in § 4A1.2(k) without expanding them.

Counsel juxtaposed the language in the applicable commentary to the language in § 4A1.2(c), which states, "[s]entences for the following prior offenses and offenses similar to them, by whatever name they are known. . . ." U.S.S.G. §

7

4A1.2(c)(1). Arguing that § 4A1.2(c) illustrates Congress's ability to draft a section with expansive language, counsel asserts that the lack of the catch-all provision in § 4A1.2(k) indicates Congress's wish to limit the application of § 4A1.2(k) to the specific forms of release listed.

We find this argument meritless. More importantly, it was never made in Wright's brief. To give it serious consideration now violates a long standing rule that issues and contentions not raised in the initial brief are deemed abandoned. *See United States v. Curtis*, 380 F.3d 1308, 1310 (11th Cir. 2004). As such, we treat the commentary as authoritative and find that the enumerated forms of supervision are not exhaustive. Because the Sentencing Commission's intent is clear, we need not address the rule of lenity. *Camacho-Ibarquen*, 410 F.3d at 1315. Therefore, the central issue is whether community control is a similar form of release subject to § 4A1.2(k).

### *Similar Form of Release*

The government argues that community control is a similar form of release to probation. The government relies on Florida law to inform its interpretation. Chapter 948 of the Florida Statutes, entitled "Probation and Community Control," defines probation as "a form of community supervision requiring specified contacts with parole and probation officers." Fla. Stat. § 948.001(5). The same

8

statute defines community control as "a form of intensive, supervised custody in the community, including surveillance on weekends and holidays, administered by officers with restricted caseloads." Fla. Stat. § 948.001(2). The statute explains that "[c]ommunity control is an individualized program in which the freedom of an offender is restricted within the community, home, or noninstitutional residential placement and specific sanctions are imposed and enforced." *Id.*

Florida considers community control to be a hybrid concept, "less restrictive than prison, but more severe than probation." *Bacon v. State,* 620 So. 2d 1084, 1086 (Fla. 1st DCA 1993). It is undisputed that Florida recognizes probation and community control as separate and distinct punishments. *See State v. Mestas*, 507 So. 2d 587, 588 (Fla. 1987); *Zack v. State,* 753 So. 2d 9, 25 (Fla. 2000). However, the question before us is not whether they are the same punishment. Rather, it is whether they are similar forms of release.

Florida considers both probation and community control to be discretionary alternatives to imprisonment. *See* Fla. Stat. § 948.011 ("when the defendant's offense is punishable by both fine and imprisonment, the trial court may, in its discretion, impose a fine upon him or her and place him or her on probation or into community control as an alternative to imprisonment."). Both are conditional forms of release subject to revocation. *See* Fla. Stat. § 948.06. Florida law lumps

together "probation, community control, parole, [and] conditional release" as "postprision release supervision." *See* Fla. Stat. § 394.927(2).

However, state law merely informs our analysis of what is, ultimately, a federal issue. The Sentencing Guidelines must be interpreted in accordance with federal law, even when the Guidelines refer to some event occurring in state court. *See United States v. Glover*, 154 F.3d 1291, 1294 (11th Cir. 1998). The Guidelines apply to prior convictions from all fifty states, in addition to federal, foreign, tribal and military courts. U.S.S.G. § 4A1.1 cmt. backg'd. As such, there is inevitably variation in the terminology utilized by the individual jurisdictions. Therefore, we look to the substance of the punishment, rather than its title.

This circuit has yet to interpret the term community control. However, other circuits' decisions provide some guidance. Although the issue was uncontested, the Sixth Circuit agreed that "a community corrections sentence is sufficiently analogous to probation to warrant the application of § 4A1.2(k)(1)."[4] *United States v. Wheeler*, 330 F.3d 407, 411, n. 5 (6th Cir. 2003). When faced with an uncategorized term, the Seventh Circuit compared the purpose of probation and the

[4] In Tennessee, "community corrections" is a community based alternative to incarceration. Tenn. Code Ann. § 40-36-103. The Community Corrections Act "promoted accountability of offenders to their local community; filled gaps in the local correctional system through the development of a range of sanctions and services; reduced the number of nonviolent felony offenders in correctional institutions and jail; and provided 'opportunities for offenders demonstrating special needs to receive services which enhance their ability to provide for their families and become contributing members of their community.'" *State v. Cummings*, 868 S.W. 2d 661, 667 (Tenn. Crim. App. 1992) (quoting Tenn. Code Ann. § 40-36-104).

10

purpose of Illinois's "conditional discharge" and found they were sufficiency

analogous to warrant the application of the Guidelines.[5] *United States v. Caputo*,

978 F.2d 972, 976-77 (7th Cir. 1992).

Under the Sentencing Guidelines, probation is a "sentence in and of itself."

U.S.S.G. § 5B1.1 intro. cmt. Probation may be used as an alternative to

incarceration, provided that the conditions imposed serve the statutory purposes of

sentencing. *See id.* Those statutory purposes include "promoting respect for the

law, providing just punishment for the offense, achieving general deterrence, and

protecting the public from further crimes by the defendant." *Id.* Likewise,

Florida's community control "contains rules, requirements, conditions, and

programs that are designed to encourage noncriminal functional behavior and

promote the rehabilitation of the offender and the protection of the community."

*See* Fla. Stat. § 948.01(3)(b).

We have held that the primary purpose of probation is "rehabilitation, the

accomplishment of which will serve to protect the public." *United States v.

Gaskell*, 134 F.3d 1039, 1045 (11th Cir. 1998) (quoting *United States v.

Engelhorn*, 122 F.3d 508, 512 (8th Cir. 1997)). Probation allows the government

---

[5] In Illinois, conditional discharge is a discretionary alternative to imprisonment. *See People v. Butchek*, 317 N.E. 2d 148, 156 (Ill. App. Ct. 1974). It is a conditional and revocable release without probationary supervision but under such conditions as may be imposed by the court. 730 Ill. Comp. Stat. 5/5-1-4.

to oversee an offender's rehabilitation while giving federal courts the authority to incarcerate the offender if he or she violates any of the stated conditions. *See id*. We find that Florida's community control program serves a similar purpose.

In comparing community control to probation, both are alternative, community-based methods to punish offenders in lieu of incarceration. Both are discretionary forms of release subject to revocation. Both release the offender into the community subject to stated conditions and require extensive government supervision to ensure compliance. Both contain conditions specifically designed to rehabilitate the offender and promote respect for the law while simultaneously protecting the public.

We recognize that probation and community control have some minor differences, but examination of the content of both reveals strong similarities in their purpose and application. Based on those similarities, we find that they are similar forms of release as contemplated by the Sentencing Guidelines. Therefore, we find that community control is sufficiently analogous to probation to warrant the application of U.S.S.G. § 4A1.2(k).

**B. 18 U.S.C. § 922 (g)**

Wright argues that his conviction is unconstitutional and must be vacated because his possession of a firearm and ammunition did not substantially affect

interstate commerce. He notes that every subsection of § 922 limits the statute to interstate or foreign commerce, except for § 922(g), which extends the statute to the possession of a firearm that is "in or affecting commerce." 18 U.S.C. § 922(g). Wright asserts that "Congress has intended to reach purely intrastate commerce by this section of the statute," which is beyond its power derived from the Commerce Clause and therefore, unconstitutional. Wright concedes that he did not raise this argument below but argues that plain error relieves him of that burden.

Generally, we review *de novo* the constitutionality of a statute because it is a question of law. *See United States v. Cespedes*, 151 F.3d 1329, 1331 (11th Cir. 1998). However, we review Wright's challenge regarding the constitutionality of § 922(g) for plain error because he raises it for the first time on appeal. *See United States v. Jones,* 289 F.3d 1260, 1265 (11th Cir. 2002). Plain error occurs if (1) there was error, (2) that was plain, (3) that affected the defendant's substantial rights, and (4) that seriously affected the "fairness, integrity, or public reputation of judicial proceedings." *Id.*

The government responds that Wright fails to demonstrate plain error because this court has already held that 18 U.S.C. § 922(g)(1) is not constitutionally invalid under the Commerce Clause. *United States v. Nichols*, 124 F.3d 1265, 1266 (11th Cir. 1997). We agree. *Nichols* rejected an identical

13

constitutional challenge to § 922(g)(1) that the term "commerce" is not defined as "interstate or foreign commerce." 124 F.3d at 1266. In making that determination, we reviewed the Supreme Court's holding in *Scarborough v. United States*. 431 U.S. 563, 571, 97 S. Ct. 1963, 1967 (1977). Specifically, we noted that the passage "'in or affecting commerce' indicates a Congressional intent to assert its full Commerce Clause power." *Id*. We also noted in *United States v. McAllister*, that "§ 922(g)(1) is not an unconstitutional exercise of Congress's power under the Commerce Clause." 77 F.3d 387, 389 (11th Cir. 1996). Accordingly, we reject Wright's challenge to the constitutionality of § 922(g).

Wright further contends that § 922(g) is unconstitutional as applied because mere possession of a firearm and ammunition does not substantially affect interstate commerce. However, § 922(g) only requires that the government prove some "minimal nexus" to interstate commerce, which it may accomplish by "demonstrat[ing] that the firearm possessed traveled in interstate commerce." *United States v. Scott*, 263 F.3d 1270, 1274 (11th Cir. 2001). Here, the government established that the firearms involved in Wright's offense were manufactured outside of Florida, the state in which the offense took place. Thus, the firearms necessarily traveled in interstate commerce and therefore satisfied the minimal nexus requirement. Accordingly, we find no merit in Wright's assertion

14

that § 922(g) is unconstitutional as applied to him.

## III. CONCLUSION

For the foregoing reasons, the judgment of the district court is,

AFFIRMED.

PRYOR, Circuit Judge, concurring, in which FAY, Circuit Judge, joins:

I concur fully in the majority opinion. I agree that we have no occasion to apply the rule of lenity in this appeal because section 4A1.2(k)(1) of the Sentencing Guidelines is unambiguous, but I write separately to explain why I doubt the rule of lenity should play any role in our interpretation of advisory Sentencing Guidelines.

This Court has invoked the rule of lenity to interpret ambiguous provisions of the Sentencing Guidelines on two occasions, both when the Guidelines were mandatory, but we have never explained whether applying the rule of lenity to the Guidelines serves the purposes that underlie the rule. See United States v. Inclema, 363 F.3d 1177, 1182 (11th Cir. 2004); United States v. Rolande-Gabriel, 938 F.2d 1231, 1237–38 (11th Cir. 1991). Those purposes are to "ensure[] that criminal statutes will provide fair warning concerning conduct rendered illegal and strike[] the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability." Liparota v. United States, 471 U.S. 419, 427, 105 S. Ct. 2084, 2089 (1985).

The decision of the Supreme Court in United States v. Booker weakened the logic that might have supported our application of the rule of lenity to mandatory Sentencing Guidelines because that decision made the Guidelines advisory. 543

16

U.S. 220, 259, 125 S. Ct. 738, 764 (2005). Whether we should continue to apply the rule of lenity to advisory Sentencing Guidelines is an open question in this Circuit. That question warrants careful consideration when it is presented to this Court.

The rule of lenity is a canon of statutory construction that requires courts to construe ambiguous criminal statutes narrowly in favor of the accused. See United States v. Wiltberger, 18 U.S. (5 Wheat.) 76, 95 (1820). In England, courts strictly construed criminal laws "to protect the common criminal from capital punishment." Phillip M. Spector, The Sentencing Rule of Lenity, 33 U. Tol. L. Rev. 511, 518 (2002). Although the rule of lenity has its roots in seventeenth century England, see Livingston Hall, Strict or Liberal Construction of Penal Statutes, 48 Harv. L. Rev. 748, 749–50 (1935), American courts later applied the rule for distinctly American reasons, which were "forged in the furnace of American constitutionalism." Spector, supra, at 521.

Chief Justice John Marshall explained that the rule of lenity serves two constitutional principles—due process of law and separation of powers:

> The rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself. It is founded on the tenderness of the law for the rights of individuals; and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department. It is the legislature, not the Court, which is to define a crime, and ordain its punishment.

17

Wiltberger, 18 U.S. (5 Wheat.) at 95. The rule respects the rights of individuals by requiring fair warning of "'what the law intends to do if a certain line is passed.'" United States v. Bass, 404 U.S. 336, 348, 92 S. Ct. 515, 522 (1971) (quoting McBoyle v. United States, 283 U.S. 25, 27, 51 S. Ct. 340, 341 (1931)). And the rule protects the balance of power among the three branches of government by reserving to the legislature the task of determining what conduct to prohibit and what punishment to impose. Id., 92 S. Ct. at 523. When courts construe ambiguous criminal statutes in favor of the accused, the judicial branch refrains from expansively interpreting criminal statutes so as to prohibit more conduct or punish more severely than Congress intended. See Ladner v. United States, 358 U.S. 169, 177–78, 79 S. Ct. 209, 214 (1958).

Consistent with these animating concerns, the Supreme Court has applied the rule of lenity "not only to interpretations of the substantive ambit of criminal prohibitions, but also to the penalties they impose." Bifulco v. United States, 447 U.S. 381, 387, 100 S. Ct. 2247, 2252 (1980); see also United States v. R.L.C., 503 U.S. 291, 305, 112 S. Ct. 1329, 1338 (1992). Bifulco involved the interpretation of a penalty provision of the Comprehensive Drug Abuse Prevention and Control Act of 1970. 447 U.S. at 382–83, 100 S. Ct. at 2250. That provision stated the penalty for conspiracy as "imprisonment or fine or both" and limited the maximum

18

punishment for conspiracy to the maximum punishment available for the substantive target offense.  Id. at 385, 100 S. Ct. at 2251.  The question before the Court was whether the provision permitted the imposition of a special parole term. Id. at 382–83, 100 S. Ct. at 2250.  Because Congress had not unambiguously "authorize[d] special parole terms as punishment for those convicted of drug conspiracies," the Supreme Court strictly construed the provision in favor of the accused and held that it did not permit the imposition of a term of special parole. Id. at 400–01, 100 S. Ct. at 2259.

More recently, the Supreme Court invoked the rule of lenity in construing the phrase "original sentence" in a provision of the Anti-Drug Abuse Act of 1988, which provided that "if a defendant is found by the court to be in possession of a controlled substance . . . the court shall revoke the sentence of probation and sentence the defendant to not less than one-third of the original sentence." United States v. Granderson, 511 U.S. 39, 44, 54, 114 S. Ct. 1259, 1263, 1267–68 (1994) (internal quotation marks and emphasis omitted).  The Supreme Court concluded that the phrase "original sentence" was ambiguous and held that "original sentence" refers to the sentence of imprisonment that the district court had authority to impose under the Guidelines, not to the original sentence of probation that the district court actually imposed.  Id. at 54, 114 S. Ct. at 1267–68.  As these

19

decisions illustrate, when courts are unable to discern what punishment Congress intended to impose, they must resolve ambiguity in the statute "against the imposition of a harsher punishment." Bell v. United States, 349 U.S. 81, 83, 75 S. Ct. 620, 622 (1955).

Although the Supreme Court frequently has applied the rule of lenity to ambiguous criminal statutes, it has not considered whether the rule of lenity applies to the Sentencing Guidelines. As originally enacted, the Sentencing Reform Act of 1984 established the Sentencing Commission "as an independent commission in the judicial branch," directed the Commission to "devise guidelines to be used for sentencing," and required sentencing courts to impose sentences within the applicable guidelines ranges. Mistretta v. United States, 488 U.S. 361, 367–68, 109 S. Ct. 647, 652–53 (1989) (internal quotation marks omitted). Because the Act made the Guidelines mandatory, the Supreme Court "consistently held that the Guidelines ha[d] the force and effect of laws." Booker, 543 U.S. at 234, 125 S. Ct. at 750.

After the enactment of the Sentencing Reform Act, this Court and nearly all of our sister circuits held or stated in dicta that the rule of lenity applies to ambiguous provisions of the then mandatory Sentencing Guidelines. See Inclema, 363 F.3d at 1182; United States v. Simpson, 319 F.3d 81, 86–87 (2d Cir. 2002);

20

United States v. Fenton, 309 F.3d 825, 828 n.3 (3d Cir. 2002); United States v. Boucha, 236 F.3d 768, 776 (6th Cir. 2001); United States v. Gay, 240 F.3d 1222, 1232 (10th Cir. 2001); United States v. Bowen, 127 F.3d 9, 13–15 (1st Cir. 1997); United States v. Fuentes-Barahona, 111 F.3d 651, 653 (9th Cir. 1997); United States v. Lazaro-Guadarrama, 71 F.3d 1419, 1421 (8th Cir. 1995); United States v. Cutler, 36 F.3d 406, 408 (4th Cir. 1994); United States v. Burke, 888 F.2d 862, 866 (D.C. Cir. 1989).  Only the Second Circuit offered an explanation for its decision to apply the rule of lenity to the Sentencing Guidelines.  See Simpson, 319 F.3d at 86.  After observing that the purposes of the rule of lenity are to promote fair notice, decrease the risk of arbitrary enforcement, and to maintain the proper balance of powers, the Second Circuit summarily concluded that "[a]pplication of the rule of lenity to the Guidelines promotes these goals."  Id. at 87.

The Seventh Circuit disagreed and held that the rule of lenity does not apply to the Sentencing Guidelines.  United States v. Mrazek, 998 F.2d 453, 455 (7th Cir. 1993) (Easterbrook, J.); see also United States v. White, 888 F.2d 490, 497–98 (7th Cir. 1989) (Easterbrook, J.), abrogated on other grounds by United States v. Stinson, 508 U.S. 36, 113 S. Ct. 1913 (1993).  In an opinion by Judge Frank Easterbrook, the Seventh Circuit distinguished the Sentencing Guidelines from criminal statutes by explaining that the Guidelines "set neither maximum nor

21

minimum penalties" and only "structure and confine the ways in which judges exercise discretion in sentencing." White, 888 F.2d at 498. The Seventh Circuit considered the purposes that underlie the rule of lenity and concluded that they were not in play: "We are not at risk of imposing penalties greater than Congress authorized, or of inducing the ultracautious to abstain from lawful activities that might be confused with the subjects of the statute; we are not worried about the adequacy of notice." Id.

The reasoning of the Seventh Circuit in White relied in part on an assumption that the Sentencing Guidelines did not set minimum or maximum penalties and that judicial interpretation of the Guidelines did not present a risk that a court would impose a sentence greater than Congress had permitted, see id. at 498, but that assumption was debatable when the Guidelines were mandatory. As the Supreme Court explained one year after the Seventh Circuit decided White, "[t]he answer to any suggestion that the statutory character of a specific penalty provision gives it primacy over administrative sentencing guidelines is that the mandate to apply the Guidelines is itself statutory." R.L.C., 503 U.S. at 297, 112 S. Ct. at 1334. Because Congress required sentencing courts to apply the Sentencing Guidelines and impose a sentence within the applicable guidelines range, it was reasonable to view the Guidelines as effectively setting minimum and

22

maximum penalties that varied based on the circumstances of the offense and the characteristics of the offender.

When this Court invoked the rule of lenity to interpret ambiguous provisions of the Sentencing Guidelines, the Guidelines were mandatory. See Inclema, 363 F.3d at 1182; Rolande-Gabriel, 938 F.2d at 1238. Even if we were correct to apply the rule of lenity to mandatory Sentencing Guidelines, those decisions no longer bind us because the Supreme Court made the Guidelines advisory in Booker. 543 U.S. at 259, 125 S. Ct. at 764. Although they still must take account of the Guidelines, pertinent policy statements, and the purposes of sentencing, district courts no longer are statutorily required to impose a sentence within the guidelines range. Id. We have not applied the rule of lenity to the Sentencing Guidelines since Booker, nor have we considered whether we should. Whether the rule of lenity applies to advisory Sentencing Guidelines is an open question in this Circuit.

In my view, it is doubtful that the judicial interpretation of advisory Sentencing Guidelines promulgated by an independent commission implicates either of the twin concerns that motivate the rule of lenity. The first concern—fair warning—is not at issue because the Guidelines "do not bind or regulate the primary conduct of the public." Mistretta, 488 U.S. at 396, 109 S. Ct. at 667. The

23

concern about fair warning is rooted in "the belief that fair warning should be accorded as to what conduct is criminal and punishable by deprivation of liberty or property." Huddleston v. United States, 415 U.S. 814, 831, 94 S. Ct. 1262, 1272 (1974). The Sentencing Guidelines do not make any conduct criminal, so "[w]e are not at risk of . . . inducing the ultracautious to abstain from lawful activities that might be confused with the subjects of the statute." White, 888 F.2d at 498. The Sentencing Guidelines come into play only after someone has been convicted of a criminal offense. The second concern—separation of powers—also is not at issue. The rule of lenity promotes separation of powers by reserving to Congress the power to "define a crime, and ordain its punishment." See Wiltberger, 18 U.S. (5 Wheat.) at 95. As explained above, the Sentencing Guidelines do not define crimes, so we are not at risk of usurping that congressional prerogative. Nor do advisory Sentencing Guidelines ordain punishments for the various criminal offenses. After Booker, the fetters that Congress had placed on the discretion of district courts to sentence within the statutory range are no longer binding. Sentencing courts are free to impose any sentence within the statutory range established by Congress, subject to appellate review for reasonableness. See Booker, 543 U.S. at 264, 125 S. Ct. at 767. Consequently, our interpretation of advisory Sentencing Guidelines presents no risk that we will "impos[e] penalties

24

greater than Congress authorized." White, 888 F.2d at 498. It is still true that "[o]ur interpretation of sentencing guidelines and accompanying commentary is governed by traditional rules of statutory construction," United States v. Perez, 366 F.3d 1178, 1182 (11th Cir. 2004), but the purposes of the rule of lenity suggest that it plays no role in the interpretation of advisory guidelines.

We need not construe an ambiguous provision of the Sentencing Guidelines strictly or liberally. Instead, we should construe it "reasonably, to contain all that it fairly means." Antonin Scalia, A Matter of Interpretation: Federal Courts and the Law 23 (1997). As Judge Easterbrook put it, "Our task is to find the best reading of the text, without a thumb on the scale." Mrazek, 998 F.2d at 455.