[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-10464

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

MICHAEL TYRONE YOUNG,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 5:21-cr-00088-JA-PRL-1

_____

Before WILSON, JILL PRYOR, and LUCK, Circuit Judges.

PER CURIAM:

On appeal, Michael Tyrone Young challenges his conviction for possessing a firearm as a convicted felon in violation of 18 U.S.C. § 922(g)(1). He argues that the district court erred in denying his motion to suppress evidence and also that § 922(g)(1)'s prohibition on felons possessing firearms is unconstitutional. After careful consideration, we affirm.

## I.

In the early hours of August 31, 2021, police officers Joseph Tussey and Jacob Zaino stopped Young in a common area of the Berkeley Pointe Apartments complex in Ocala, Florida. During the stop, officers saw that Young was carrying a firearm and learned that he had a felony conviction. The officers arrested Young who was charged with one count of possessing a firearm as a convicted felon in violation of 18 U.S.C. § 922(g)(1). In this section, we discuss the proceedings related to Young's motion to suppress and then review the remainder of the proceedings in his criminal case.

## A.

In the district court, Young moved to suppress evidence from the stop, arguing that the officers had violated his Fourth Amendment rights. A magistrate judge held an evidentiary hearing on the motion to suppress.

At the hearing, the government presented testimony from several law enforcement officers, including Tussey and Zaino, as well as from an employee of the company that managed the Berkeley Pointe apartment complex. These witnesses testified about the complex as well as what happened during the stop.

We begin by reviewing the evidence introduced about the apartment complex. Berkeley Pointe, a public-housing complex in Ocala, is made up of 20 two-story apartment buildings arranged in a circle. Each building is assigned a number and holds eight apartments, four on the bottom floor (units A through D) and four on the top floor (units E through H). Each floor has an open-air breezeway with a staircase at each end.

The entire apartment complex is surrounded by a six-foot tall fence. There are gates for vehicles and pedestrians to enter and exit the complex. The vehicle gates often have mechanical problems. When one of these gates is broken, it is left open. Next to the vehicle gates is a pedestrian gate. The pedestrian gate is supposed to lock automatically so that only residents with key cards can use it to enter or leave the complex. But the lock on the pedestrian gate is often broken, meaning that anyone can use the gate to enter the complex. In addition to the vehicle and pedestrian gates, there is another way people regularly enter and exit the complex. At the back of the complex, there is a chain link fence, which is broken in numerous places. Residents and others often enter or exit the property through the broken portions of the chain link fence.

At the suppression hearing, the government introduced evidence about the rules regarding guests at Berkeley Pointe. Individuals must apply to live at Berkeley Pointe. To be accepted as a resident, an applicant must pass a background check and also meet the income requirements for public housing. Before moving in, an applicant must sign a lease and agree to the community rules. These rules permit residents to host guests. But management must give approval for any guest who stays at the complex for longer than 72 hours. In addition, any guest who stays longer than 14 consecutive days is considered an unauthorized occupant.

The government also presented testimony about the prevalence of crime at Berkeley Pointe. Officers testified that the complex was in a high crime area. Crimes that have occurred at the complex include assaults, batteries, and shootings, as well as drug and gang activity. To combat crime, the owners of Berkeley Pointe asked Ocala police to patrol the complex. They have given police an access code for the vehicle gate so that officers can enter quickly in case of emergency. And they have authorized police to issue trespass warnings to individuals encountered inside the complex who were not authorized to be there.

In 2021, Ocala police officers were present at the Berkeley Pointe complex on a regular basis. Officers patrolled the complex approximately 50 times each day, during the day and at night. Some officers would drive through the complex in their police cars with their lights on to make their presence known. Other officers including Tussey, one of the officers who stopped Young, would

patrol the complex on foot. Tussey preferred this approach because there were often people sitting near the vehicle gates who would alert others when a police officer entered the complex. To avoid detection, Tussey sometimes would enter by scaling the chain link fence in the back.

At the suppression hearing, Tussey and Zaino testified about the events that led to Young's arrest. At approximately 1:00 a.m. on August 31, Tussey was on patrol with Zaino, who had recently joined the Ocala Police Department. Because they were not busy with emergency calls, Tussey decided they would patrol Berkeley Pointe. At that time, one of the vehicle gates was broken and had been left open. In addition, the pedestrian gate was broken and left open. But Tussey and Zaino entered the complex by scaling the chain link fence at the back of the complex.

As they approached one of the buildings, Tussey and Zaino heard male voices coming from the lower floor of the building. The officers stood at the corner of the building and observed the breezeway through a one-inch gap between the downspout and the wall.

Tussey and Zaino saw two Black men standing at the far end of the unlit breezeway. Tussey suspected that lightbulbs had been removed from the breezeway to conceal activity. While the officers were watching the men, they heard an object hit the concrete floor and saw one of the men retrieve the object. Tussey could not identify the object but noticed that it made a heavy sound. Zaino saw one of the men pick up the object and put it in his waistband.

That man, who turned out to be Young, walked down the breezeway toward where the officers were hidden. After Young walked past Apartment D, Tussey turned on his flashlight, rounded the corner, and identified himself as an officer. Young turned back toward Apartment D, which he had just walked by, and knocked on the door.

When Tussey announced himself, Young told Tussey that he lived in the apartment. Tussey, who had previously responded to calls at Apartment D, knew that Young did not live there. Around this time, Tussey's body camera began to record the encounter. Tussey told Young that he was at Berkeley Pointe to "combat all of the shootings and things like that." Doc. 36-2 at 1.[1] Tussey mentioned that Young appeared a "little nervous." *Id.*

A young boy opened the door to Apartment D and greeted Young and Tussey. Young yelled "Mom" into the apartment and attempted to run inside. *Id.* Tussey asked Young to have someone who lived in the apartment vouch that he lived there.

Soon, an older white woman came to the door. Tussey asked the woman if she knew the name of the man who was standing at the door. The woman answered that she did not know the man. Tussey then observed Young gesturing to the woman and trying to tell her his name. A few second later, the woman identified the man as Mike. Tussey was unconvinced that the woman

---

[1] "Doc." numbers refer to the district court's docket entries.

knew him. While Tussey was standing near Young, he smelled the odor of marijuana on Young.

Tussey placed Young in handcuffs, saying that he was going to detain him while he determined whether he lived in the apartment. By this time, a crowd, including a group from Apartment B, had gathered in the hallway. The group was yelling and complaining about Tussey's detention of Young. Tussey responded that Young was being detained but probably was not going to jail. Tussey explained that the man was "in a time, in a place, in a manner not usual for law-abiding citizens" because he was in a "high crime area" and "knocking on a stranger's door that doesn't know him." *Id.* at 4. Tussey also said that the man had refused to identify himself. In fact, though, Tussey had not yet asked the man for his name. After Tussey made this comment, Young identified himself as Michael Young.

Young's cousin, who was in the crowd, questioned why Young was being detained, asking Tussey, "What is your probable cause, sir?" *Id.* at 5. Tussey responded that he had detained Young for loitering and prowling. At this point, Tussey did not mention smelling marijuana.

Tussey continued to question Young, asking why he was acting nervous and what his connection was to the apartment complex. Young told Tussey that he was nervous because Tussey had scared him by jumping out from behind the corner. At one point, Young begged Tussey not to shoot him. Tussey responded that he was not going to shoot and asked Young to relax. Tussey explained

again that Young was detained because it was the middle of the night and he had knocked on someone's apartment door who did not know him.

After Young had been detained for a few minutes, Tussey stated that Young smelled like marijuana and asked when he had last smoked. Young responded that he had smoked marijuana about four hours earlier but did not have any marijuana on him.

Tussey continued to press Young about his identity. Tussey requested identification, but Young did not have any identification with him. Tussey then asked Young for his Instagram handle, which Young readily provided. Young also offered to provide his Facebook account information. Around this time, Young's cousin yelled something about Rodney King. Tussey responded, "Man, Rodney King was like 50 years ago" and told him to, "let it go." *Id.* at 9. Tussey then asked Young for his social security number, which Young provided. At Tussey's direction, Zaino radioed other officers to verify Young's identity.

After members of the crowd said that they knew Young, Tussey agreed to let Young go. But before he could release Young, Tussey said, he needed to search Young because Young smelled of marijuana. He asked Young, who was sitting on the ground, to stand up. Young insisted that he did not have anything on him and would not stand up. At this point, a firearm fell from the waistband of Young's pants to the ground. Approximately nine minutes passed from the moment when Tussey pulled out the handcuffs to detain Young to when the firearm fell.

Upon seeing the weapon, Tussey asked Young whether he had a permit to carry a concealed weapon. Young responded that the permit was in his house. Tussey then radioed other officers to check whether Young had a permit. That check revealed that Young did not have a permit to carry a concealed weapon and that he was a convicted felon. Tussey placed Young under arrest.

After reviewing Young's rights, Tussey questioned him. Young explained that the gun was the item he had dropped before the officers appeared. Young also admitted that he smelled of marijuana.

At the evidentiary hearing, Young questioned Zaino about whether he smelled a marijuana odor. Zaino testified that he smelled marijuana during the encounter. But Zaino said that he could not pinpoint the smell to a particular person.

Young also introduced evidence at the hearing showing that Tussey had previously given a false statement in connection with another investigation. In 2015, Tussey was part of a team that was executing a warrant to arrest a fugitive. Tussey's police report stated that he had given a verbal warning before entering a hotel room where he believed the fugitive to be. But footage captured from Tussey's body camera showed that he identified himself as a maintenance worker, not a law enforcement officer, when he entered the room. An internal investigation later found that Tussey made a false statement in an official report. Because of the false statement, the state ended up dropping some charges against the fugitive, Tussey was required to take 40 hours of unpaid leave, and

a state attorney recommended that Tussey wear a body camera when executing warrants.

At the hearing, Young called one witness: Shawneeka Townsend, his girlfriend who lived in the Berkeley Pointe complex. Townsend testified that on August 31, Young was staying at her apartment. According to Townsend, Young sometimes stayed at the apartment for more than three days at a time but never for more than 14 consecutive days.

After the evidentiary hearing, the magistrate judge recommended that the district court deny the motion to suppress. The magistrate judge began by considering whether Young had a reasonable expectation of privacy in the common areas of the Berkeley Pointe complex such that a Fourth Amendment violation occurred when the officers were present inside the complex without a warrant. The magistrate judge assumed that Young was a resident or a guest at the complex but concluded that he had no reasonable expectation of privacy in the common areas of the complex. The magistrate judge found that the complex was "not fully enclosed and secured from the public," noting that anyone could access the complex through the pedestrian gate or by climbing over the damaged chain link fence. Doc. 46 at 10. Because the breezeway where the officers encountered Young was "open and accessible to . . . the public at large" and because the management of the complex had given police permission to routinely patrol the complex, the magistrate judge concluded that Young had no reasonable

expectation of privacy in the common areas of the complex. *Id.* at 11.

The magistrate judge then considered whether a Fourth Amendment violation occurred during the officers' interaction with Young. The magistrate judge determined that the officers' initial interaction with Young did not implicate the Fourth Amendment because after seeing two men in the unlit breezeway late at night, the officers "were free to approach and ask questions." *Id.*

But the analysis changed when Tussey detained Young to conduct a further investigation. The magistrate judge concluded that no Fourth Amendment violation occurred because at the time that Young was detained, the officers had reasonable suspicion of criminal activity. The magistrate judge explained that the officers briefly detained Young to conduct a further investigation after observing him in a darkened hallway late at night and seeing him drop and retrieve a heavy object that could have been a weapon. When the officers approached Young, he became nervous and attempted to enter Apartment D. Young then "ignored" Tussey's questions about who lived in the apartment and instead called "Mom" or "Mama" into the apartment. *Id.* at 13. The magistrate judge found that when the tenant of the apartment came out, she "initially did not know [Young's] name" and changed her answer only "after Young mouthed something to her." *Id.* The magistrate judge also noted that during this interaction, Tussey observed that Young smelled of marijuana. The magistrate judge concluded that these facts created reasonable suspicion that Young had committed the

Florida crime of loitering or prowling. Further, the odor of marijuana justified Young's detention.

In making these findings, the magistrate judge credited Tussey's testimony. The magistrate judge rejected Young's argument that Tussey was not credible because of the previous incident when he had been disciplined for making a false report. In making this credibility determination, the magistrate judge noted that Tussey's testimony about the stop was consistent with his body camera footage. Although Tussey's statement that he could smell marijuana on Young was not corroborated by Zaino, the magistrate judge determined that it was consistent with Young's admissions that he had smoked marijuana earlier that day and that he smelled of marijuana.

Young objected to the recommendation. The district court overruled the objection, adopted the magistrate judge's recommendation, and denied the motion to suppress.

**B.**

After the district court denied the motion to suppress, Young agreed to a bench trial based on stipulated facts. The district court found Young guilty of possessing a firearm as a convicted felon. He was sentenced to 33 months' imprisonment to be followed by three years of supervised release. This is Young's appeal.

**II.**

When we review the denial of a suppression motion, we review the district court's factual findings for clear error, viewing the

evidence in the light most favorable to the government. *United States v. Spivey*, 861 F.3d 1207, 1212 (11th Cir. 2017). We review *de novo* the district court's application of the law to the facts. *Id.*

Although we generally review *de novo* the constitutionality of a statute, we review for plain error when a defendant raises his constitutional challenge to his statute of conviction for the first time on appeal. *United States v. Wright*, 607 F.3d 708, 715 (11th Cir. 2010). To show plain error, a defendant must establish (1) there was error, (2) that was plain, (3) that affected the defendant's substantial rights, and (4) that seriously affected the fairness, integrity, or public reputation of judicial proceedings. *Id.* An error is plain only if it is contrary to a federal statute or on-point precedent from this Court or the United States Supreme Court. *United States v. Hoffman*, 710 F.3d 1228, 1232 (11th Cir. 2013).

## III.

Young raises two issues on appeal. First, he argues that the district court erred when it denied his motion to suppress. Second, he argues that the federal prohibition on felons possessing firearms is unconstitutional. We address each issue in turn.

## A.

The Fourth Amendment secures the right of the people to be free from unreasonable searches and seizures by the government. U.S. Const. amend. IV. Fourth Amendment rights are personal, and only those individuals with a legitimate expectation of privacy have standing to challenge the validity of a government search. *United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir. 1998).

"The individual challenging the search bears the burdens of proof and persuasion." *Id.*

Young argues on appeal that the officers violated his Fourth Amendment rights in two ways. First, he says that a constitutional violation occurred when the officers scaled the fence to access the common areas of the Berkeley Pointe complex because the officers did not have a warrant or permission from the complex's management to enter through the back fence. Second, he argues that a constitutional violation occurred when the officers detained him and questioned him for approximately nine minutes before discovering that he had a gun. We address each issue in turn.

As to the first, Young says that a constitutional violation occurred when the officers climbed over the fence because he had a reasonable expectation of privacy in the common areas of the Berkely Pointe complex where he was a guest. We disagree.

An individual has a reasonable expectation of privacy if he has a subjective expectation of privacy that society is prepared to recognize as objectively reasonable. *United States v. Miravalles*, 280 F.3d 1328, 1331 (11th Cir. 2002). An occupant other than the owner or lessee of an apartment must "demonstrate a significant and current interest in the searched premises in order to establish an expectation of privacy." *United States v. Garcia*, 741 F.2d 363, 366 (11th Cir. 1984). An occupant's status as an overnight guest generally bestows upon him an expectation of privacy in the premises. *Minnesota v. Olson*, 495 U.S. 91, 96–97 (1990).

23-10464               Opinion of the Court                    15

This appeal calls on us to decide whether a guest has a reasonable expectation of privacy not in the apartment where he is visiting but instead in a common area in a multi-unit apartment complex. We have held that there is no reasonable expectation of privacy in such a common area when it is inside a building that is locked but the lock is "undependable" or "inoperable." *See Miravalles*, 280 F.3d at 1333. We have explained that to expect privacy in a common area that is "open and accessible not only to all the many tenants and their visitors, to the landlord and all its employees, to workers of various types, and to delivery people of all kinds, but also to the public at large" is "not only unreasonable, but foolhardy." *Id.*

We likewise conclude that Young did not have a reasonable expectation of privacy in the common areas of the apartment complex. It's true that the Berkeley Pointe complex was surrounded by a fence and had gates. But the record reflects that at least one of the vehicle gates and the pedestrian gate were inoperable, meaning anyone could use them to access the complex. In addition, members of the public could access the complex's common areas by climbing over the rear chain-link fence. Because the record reflects that anyone could access the complex's common areas on August 31, we cannot say that Young had a reasonable expectation of privacy in the common areas. *See id.*[2]

_____

[2] Young also argues that a constitutional violation occurred when officers accessed the common area of the complex because they committed a trespass when they entered the property by hopping the chain link fence. Even

We now turn to Young's second argument: that a Fourth Amendment violation occurred when the officers questioned him. To start, we conclude that no Fourth Amendment violation occurred when the officers initially spoke with Young. It is well established that "[t]here is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets." *United States v. Lewis*, 674 F.3d 1298, 1303 (11th Cir. 2012) (internal quotation marks omitted).

But the Fourth Amendment was implicated when, after speaking to the tenant in Apartment D, the officers briefly detained Young to conduct a further investigation because at that point a reasonable person would not have felt free to terminate the encounter. *See United States v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011). Under the Fourth Amendment, a law enforcement officer may conduct a brief seizure or investigatory detention, known as a *Terry* stop,[3] if (1) the officer has a reasonable suspicion that the suspect was involved in, or is about to be involved in, criminal activity, and (2) the stop is "reasonably related in scope to the circumstances which justified the interference in the first place." *Id.*

To establish reasonable suspicion, there must be "a sufficiently high probability that criminal conduct is occurring to make

---

assuming a Fourth Amendment violation occurs when officers commit a trespass, *see United States v. Jones*, 565 U.S. 400 (2012), we cannot say that any trespass occurred here because the management of the complex had given officers permission to enter the complex to patrol common areas.

[3] *See Terry v. Ohio*, 392 U.S. 1 (1968).

the intrusion on the individual's privacy interest reasonable." *United States v. Yuknavich*, 419 F.3d 1302, 1311 (11th Cir. 2005) (internal quotation marks omitted). In this inquiry, a court considers "the totality of the circumstances" to determine whether the officer had a "particularized and objective basis for suspecting legal wrongdoing." *Id.* (internal quotation marks omitted). "The officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the intrusion. *Id.* (internal quotation marks omitted).

Here, after considering the totality of the circumstances, we conclude that the officers had a reasonable suspicion of criminal activity when they detained Young.[4] The officers had observed Young with another individual in the middle of the night in a darkened hallway of a high-crime area. They saw Young drop a heavy object that he then placed in his waistband. Young proceeded to walk by Apartment D. But when Tussey appeared, Young immediately turned around, knocked on the door of Apartment D, and tried to run inside, suggesting that he was trying to elude the officers. Young also told Tussey that he lived in Apartment D when he did not. And the officers observed that the tenant in the apartment did not know Young's name until he mouthed it to her. On top of that, Tussey smelled the odor of marijuana on Young. Considering

---

[4] Young does not dispute that at this stage of the encounter he was subjected to a *Terry* stop but had not yet been placed under arrest. *See United States v. Hensley*, 469 U.S. 221, 229 (1985) (recognizing that an officer may perform a *Terry* stop to "detain [a] person briefly while attempting to obtain further information").

the totality of the circumstances, we conclude that the officers had a particularized and objective basis for suspecting that Young was engaged in wrongdoing. Because the officers had reasonable suspicion, we hold that no constitutional violation occurred when the officers briefly detained Young to investigate further.

Young argues that in assessing whether there was reasonable suspicion we should not consider the fact that the tenant in Apartment D did not immediately recognize him because she later stated that she knew him. We disagree. The magistrate judge's factual findings, which the district court adopted, reflect that the tenant identified Young by name only after he mouthed something to her. Accordingly, in assessing whether there was reasonable suspicion, we may consider that the tenant initially stated that she did not know Young.

Young also says that the district court clearly erred in crediting Tussey's testimony, including about smelling marijuana on Young. Young points to, among other things, the incident when Tussey was disciplined for making a false statement in a police report. Certainly, this evidence shows that on another occasion Tussey made a false statement in connection with his police work. But we cannot say that this one instance compelled the district court to find Tussey's testimony not credible, particularly given that his testimony about the incident with Young was generally consistent with the events captured by his body camera. *See United States v. Stancil*, 4 F.4th 1193, 1199 (11th Cir. 2021) (explaining that we must accept a district court's credibility determination "unless it is

contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it" (internal quotation marks omitted)).

Young also challenges the scope of the detention, arguing that it was unreasonable for the officers to detain him for approximately nine minutes. When an officer conducts an investigative detention, the length of the detention must be limited in duration "to the time necessary to effectuate the purpose of the stop." *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001).

Here, the duration of the stop was reasonable. The record reflects that before finding the firearm, the officers detained Young for about nine minutes. During this time, they investigated why Young was present in the apartment complex in a high-crime area late at night while attempting to verify his identity and address as well as determine whether there was anyone in the Berkeley Pointe complex who could vouch for him. Accordingly, we reject Young's argument that the detention was unreasonable in scope. *See id.* (concluding that a detention of 14 minutes was "certainly not unreasonable on its face").

**B.**

We now turn to Young's challenge to the constitutionality of 18 U.S.C. § 922(g)(1), which generally prohibits individuals with felony convictions from possessing firearms or ammunition. According to Young, this prohibition runs afoul of the Second Amendment, which states that: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and

bear Arms, shall not be infringed." U.S. Const. amend. II. Because Young raises this argument for the first time on appeal, we review for plain error only.[5] We conclude that he cannot demonstrate plain error.

To assess the constitutionality of the prohibition on felons possessing firearms, we begin with the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008). In *Heller*, the Court considered a Second Amendment challenge to a District of Columbia law that barred the private possession of handguns in homes. *Id.* at 635. After considering both the text and history of the Second Amendment, the Court concluded that it conferred on an individual a right to keep and bear arms. *Id.* at 595. The Court ultimately held that the ban on handgun possession in the home

---

[5] Young argues that we should review this issue *de novo* even though he did not raise it below because he is making a constitutional challenge to the statute of his conviction. To support his position, he cites to the Supreme Court's decision in *Class v. United States*, 583 U.S. 174 (2018). In *Class*, the Supreme Court held that a defendant's guilty plea did not waive his right to raise on appeal a Second Amendment challenge to the federal statute prohibiting possession of a firearm on the grounds of the United States Capitol. The Court explained that the plea did not waive the constitutional challenge because the "challenge [did] not in any way deny that [the defendant] engaged in the conduct to which he admitted" when he pleaded guilty. *Id.* at 183. But nothing in *Class* addressed whether such a constitutional claim is reviewed for plain error when a defendant raises it for the first time on appeal. We conclude that plain error review applies. *See United States v. Alfonso*, 104 F.4th 815, 828–29 & n.18 (11th Cir. 2024) (explaining that plain error review applies to a "garden variety constitutional attack" that the defendant failed to raise in the district court); *Wright*, 607 F.3d at 715.

violated the Second Amendment. *Id.* at 635. But the Court acknowledged that the Second Amendment right to keep and bear arms was "not unlimited," emphasizing that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* at 626. Indeed, the Court labeled these restrictions as "presumptively lawful." *Id.* at 627 n.26.

After *Heller*, we considered a constitutional challenge to § 922(g)(1)'s prohibition on felons possessing firearms. *See United States v. Rozier*, 598 F.3d 768, 770 (11th Cir. 2010). We rejected this challenge, holding that "statutes disqualifying felons from possessing a firearm under any and all circumstances do not offend the Second Amendment." *Id.* at 771. We noted that *Heller* recognized that prohibiting felons from possessing firearms was a "presumptively lawful longstanding prohibition." *Id.* (internal quotation marks omitted).

Several years later, the Supreme Court considered a Second Amendment challenge to New York's gun-licensing regime that limited when a law-abiding citizen could obtain a license to carry a firearm outside the home. *See N.Y. State Rifle & Pistol Ass'n v. Bruen* 597 U.S. 1, 11 (2022). The Court recognized that "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." *Id.* at 10. The Court explained that to determine whether a restriction on firearms was constitutional, courts must begin by asking whether the firearm regulation at issue governs conduct that falls within the plain text

of the Second Amendment. *Id.* at 17. If the regulation does cover such conduct, the court may uphold it only if the government "affirmatively prove[s] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19. *Bruen* emphasized that *Heller* established the correct test for determining the constitutionality of gun restrictions. *See id.* at 39. And, like *Heller*, *Bruen* described Second Amendment rights as extending only to "law-abiding, responsible citizens." *Id.* at 26 (internal quotation marks omitted).

Young challenges § 922(g)(1)'s prohibition on felons possessing firearms based on *Bruen*. He points out that his felony convictions arose from controlled substances offenses and argues that "our nation's historical traditions do not support disarming people because of only nonviolent felony convictions." Appellant's Br. 61.

Young cannot demonstrate plain error because he has not identified any on-point precedent from this Court or the United States Supreme Court holding that § 922(g)(1)'s prohibition on felons possessing firearms is unconstitutional. To the contrary, Young's constitutional argument is foreclosed by precedent. After *Bruen*, we considered another Second Amendment challenge to § 922(g)(1). *See United States v. Dubois*, 94 F.4th 1284 (11th Cir. 2024). We held that the challenge was foreclosed by *Rozier*, which "interpreted *Heller* as limiting the [Second Amendment] right to law-abiding and qualified individuals and as clearly excluding felons from those categories by referring to felon-in-possession bans as presumptively lawful." *Id.* at 1293 (internal quotation marks

omitted). Although the defendant argued that *Bruen* abrogated our decision in *Rozier,* we observed that even in *Bruen*, the Supreme Court continued to describe the right to bear arms as extending only to "law-abiding, responsible citizens." *Id.* (internal quotation marks omitted). We thus concluded that *Bruen* did not abrogate *Rozier*. Because *Rozier* foreclosed a Second Amendment challenge to § 922(g)(1), we affirmed the defendant's conviction. *Id.*

The Supreme Court's recent decision in *United States v. Rahimi*, 144 S. Ct. 1889 (2024), does not change our analysis. In *Rahimi*, the Court considered a Second Amendment challenge to the federal statute that prohibits an individual who is subject to a domestic violence restraining order from possessing a firearm when the order includes a finding that he represents a credible threat to the safety of an intimate partner or a child of that partner or individual. *See id.* at 1898 (citing 18 U.S.C. § 922(g)(8)). In *Rahimi*, the Court held that this firearm restriction was constitutional. And it once again declared that the prohibition on "the possession of firearms by 'felons' . . . [is] 'presumptively lawful.'" *Id.* at 1902 (quoting *Heller*, 554 U.S. at 626, 627 n.26).

## IV.

For the reasons set forth above, we affirm the judgment of the district court.

**AFFIRMED.**