WALLACE, Judge.
John Filmore appeals the revocation of his community control following an affidavit of violation alleging an unauthorized absence from his approved residence and failure to comply with the instructions of his community control officer (the CCO). Because the trial court abused its discretion in determining that Mr. Filmore’s violations of the conditions of his community control were substantial, we reverse and remand for the reinstatement of Mr. Fil-more to supervision.
I. THE FACTS AND PROCEDURAL HISTORY
In trial court case number 2011-CF-011473, the State charged Mr. Filmore with burglary of a structure, burglary of a conveyance, and petit theft. These offenses allegedly occurred orí January 29, 2011. In trial court case number 2011-CF-015918, the State charged Mr. Filmore with kidnapping, aggravated battery, aggravated assault, and two counts of being a *1190 felon in possession of a firearm.[1] These offenses allegedly occurred on May 12, 2011.
On November 26, 2011, the State nolle prossed the two counts of felon in possession of a firearm in exchange for Mr. Filmore’s open plea of guilty to the remainder of the charges. The trial court adjudged him to be guilty on each charge. In case number 201 1-CF-011473, the trial court sentenced him to time served on the petit theft charge and to two years’ community control followed by three years’ probation on the two burglary charges. In case number 2011-CF-015918, the trial court sentenced Mr. Filmore to concurrent terms of 127.05 months in prison on the kidnapping and aggravated battery charges. However, the trial court suspended the 127.05-month prison terms. In lieu of the prison terms, the trial court placed Mr. Filmore on concurrent periods of two years’ community control followed by three years’ probation.
In pertinent part, the conditions of Mr. Filmore’s community control provided as follows:
(9) You will promptly and truthfully answer all inquiries directed to you by the court or the officer, and allow your officer to visit in your home, at your employment site or elsewhere, and you will comply with all instructions your officer may give you.
[[Image here]]
(16) You will remain confined to your approved residence except for one half hour before and after your approved employment, public service work, or any other special activities approved by your officer.
The CCO instructed Mr. Filmore on these and the other conditions of his community control on January 11, 2013. Eleven days later, on January 22, 2013, the CCO filed an affidavit alleging that Mr. Filmore had violated the conditions of his community control on January 16, 2013, as follows:
Violation of Condition of the Order of Community Control, by failing to remain confined to his approved residence except for one half hour before and after employment, public service work, treatment, or other activities approved by the officer, and as grounds for belief that the offender violated his community control, [the CCO] states the offender was away from his approved residence located at [the address of Mr. Filmore’s Tampa apartment], on 1/16/13, at 6:10 P.M., without prior approval of the officer, as evidenced by the subject not being at his residence on 1/16/13 at 6:10pm and was approved on his schedule [sic].
Violation of Condition (9) of the Order of Community Control, by failing to comply with all lawful instructions given to him by the community control officer, and as grounds for belief that the offender violated his community control, [the CCO] states that on 1/11/13, the offender was instructed to follow his community control schedule and the offender did fail to carry out this instruction by not being at his approved residence on 1/16/13 at 6:10pm.
*1191 Mr. Filmore contested the alleged violations, and the trial court conducted an evidentiary hearing on the matter on February 28, 2013.
At the time of the alleged violations, Mr. Filmore was unemployed. However, he had recently obtained a position with a garbage hauler. Mr. Filmore lived in an apartment complex in Tampa with his wife[2] and their two children. One of the amenities provided by the apartment complex was a child care center[3] for the children of residents. The center was located on the premises in the building adjacent to the building where Mr. Filmore resided. According to the CCO, the Tampa Police Department maintained a substation less than one-quarter mile from the apartment complex.
At the hearing, the CCO testified that each week she set up a schedule with Mr. Filmore based on his planned activities during the coming week.[4] On January 16, 2013, the date of the alleged violations, Mr. Filmore was scheduled to pick up “the kids” from a bus stop at the apartment complex.[5] The record is unclear concerning the identity of “the kids” that Mr. Filmore was scheduled to pick up. According to the schedule, Mr. Filmore was to accomplish this task between 3:00 and 4:00 p.m.
Mr. Filmore had fallen asleep on the afternoon in question. When he awoke and realized that he had overslept, he left his apartment and went to the center in the adjacent building to pick up “the kids.” As luck would have it, the CCO came by to check on Mr. Filmore at 6:10 p.m. When the CCO arrived at the apartment, Mr. Filmore was not present. According to the CCO’s testimony, upon her arrival, she initially observed Mr. Filmore’s neighbor, Demario Campbell, holding Mr. Filmore’s younger child (an infant) on the front steps to the apartment building. The CCO testified that the neighbor had told her that he was walking by and heard the baby crying, and not seeing Mr. Filmore, picked up the baby and began “rocking him, waiting for John to come out.” Next, the CCO observed “a little girl” leaving the apartment and asked her if her dad was home, to which the girl answered, “No.” The evidence at the hearing did not establish the identity of the “little girl” that the CCO observed leaving the apartment. At this point, the CCO left the apartment complex “really quick” and went to the nearby police substation. She returned almost immediately, accompanied by a Tampa Police Officer.
When the CCO returned to the apartment building, Mr. Filmore was there with *1192 his younger child in his arms. The CCO testified that Mr. Filmore told her that he had gone to the center to pick up a neighbor’s child. According to the CCO’s testimony, the total period of time that had elapsed between her initial arrival at Mr. Filmore’s apartment and her return to the apartment from the Tampa Police substation was between five and eight minutes. The CCO apparently had Mr. Filmore arrested immediately. On the day of the hearing, he had been in jail for forty-three days.
Mr. Filmore’s neighbor, Demario Campbell, testified at the hearing. He said that he had been at Mr. Filmore’s residence since noon. Mr. Campbell said that the only time that Mr. Filmore was away from the residence was when he went to the center to pick up his other daughter and that this is what he told the CCO. According to Mr. Campbell, Mr. Filmore returned from the center within thirty seconds or a minute after the CCO had left for the police substation. Mr. Campbell testified that Mr. Filmore was gone from his apartment for “about five, eight minutes at the most.”
Mr. Filmore testified that after realizing that he had overslept and the center was about to close, he called the CCO’s office and did not receive an answer. Then, he left his apartment and went to the onsite child care center located “in the next building over.” According to Mr. Filmore, he picked up his older daughter and the daughter of a neighbor. When the prosecutor asked Mr. Filmore why he did not send Mr. Campbell to pick up his daughter, he explained that the center would not release the child to Mr. Campbell because they did not know him. Mr. Filmore also testified that his neighbor was unable to pick up her child before the center closed. Mr. Filmore estimated that he was gone from his apartment for approximately five to seven minutes.
As the trial court noted at the conclusion of the hearing, there are inconsistencies in the CCO’s testimony concerning what Mr. Filmore and Mr. Campbell said to her on the day in question and their testimony at the hearing. It is also unclear from the evidence whether Mr. Filmore picked up one child or two children from the center. We cannot reconcile these inconsistencies in the evidence. That said, the salient points are undisputed. Mr. Filmore overslept and failed to pick up “the kids” during the hour scheduled for that purpose. When he woke up and realized his error, he called the CCO’s office and received no answer. Because the center was about to close, he left his apartment for about five to ten minutes to retrieve “the kids.” He returned with a child or children that the center released to him. In his brief absence, the CCO arrived at the apartment and found him missing. The CCO departed, then returned a few minutes later, only to find Mr. Filmore at his apartment where he was supposed to be. Mr. Campbell’s testimony confirmed that Mr. Fil-more was at his apartment from noon until shortly after 6:00 p.m. when he left to go to the nearby child care center. Mr. Fil-more did not venture beyond the limits of the apartment complex where he resided, and the period of his absence from his apartment was not more than fifteen minutes by any account.
II. THE TRIAL COURT’S RULING
Mr. Filmore’s counsel conceded at the hearing that his violation of the schedule was willful. However, she argued that the violation was not substantial and asked the trial court to return him to his community control. The trial court ruled that “any time you are on probation for a first-degree felony punishable by life, ... any *1193 violation is willful and substantial.” The trial court found Mr. Filmore in violation of Condition 9, revoked his community control, and sentenced him to 127.05 months in prison on the kidnapping and aggravated battery charges and to five years in prison on the remaining charges. The trial court designated the sentences to run concurrently.
III. THE APPLICABLE LAW
“In deciding whether to revoke a defendant’s community control, the trial court must determine whether the facts and circumstances of the case demonstrate a willful and substantial violation that is supported by the greater weight of the evidence.” Anthony v. State, 854 So.2d 744, 747 (Fla. 2d DCA 2003) (citing State v. Carter, 835 So.2d 259, 261 (Fla.2002)). On review, an appellate court must first determine whether the trial court’s finding of a willful and substantial violation is supported by competent substantial evidence. Savage v. State, 120 So.3d 619, 621 (Fla. 2d DCA 2013). Our standard of review regarding the trial court’s decision to revoke probation or community control is abuse of discretion. Id. at 623.
IV. DISCUSSION
Upon a thorough review of the record, we conclude that the trial court abused its discretion in revoking Mr. Fil-more’s community control. See Brown v. State, 86 So.3d 1225, 1226 (Fla. 2d DCA 2012) (concluding that an alleged curfew violation, which occurred because the probationer was waiting for his brother, who was assisting the probationer with job applications, was not substantial, that the State had not shown that the probationer was unfit for probation, and that revocation was “patently unfair”); Ortiz v. State, 54 So.3d 1020, 1021-22 (Fla. 2d DCA 2011) (holding that the probationer’s misstatement about the time he left work in his explanation to his probation officer about why he was late did not demonstrate that the probationer was unfit for probation and was not a substantial violation); Cruz v. State, 81 So.3d 501, 503 (Fla. 4th DCA 2012) (holding that the probationer’s violation of probation by leaving his approved residence — a tent pitched by an 1-95 ramp — to use a nearby restroom was not a substantial violation and did not demonstrate that the probationer was unfit for probation).
Here, the conduct for which the CCO violated Mr. Filmore — leaving his approved residence for a short period of time to “pick up the kids” — was an approved activity. The only problem was that he performed this essential act outside the window of time in which this activity was supposed to occur. But Mr. Filmore was only gone from his apartment for a few minutes; he did not leave his own apartment complex and did not even cross the street. Although there were minor inconsistencies in the testimony that cannot be reconciled, the State did not offer any evidence that challenged the important elements of Mr. Filmore’s version of events.[6]
We grant that Mr. Filmore’s negligence in oversleeping during the middle of the day caused the dilemma in which he found himself. However, this behavior is, at best, a single instance of negligence, analogous to other situations that this and other courts have concluded are insufficient to justify a revocation of supervision. “A violation of probation will not be found where the violation is due to negligence or *1194 ineptitude.” Garcia v. State, 701 So.2d 607, 609 (Fla. 2d DCA 1997) (holding that a probationer’s failure to obtain a psychological evaluation as directed by his probation officer was insufficient to prove that he had deliberately failed to follow instructions and the probationer had made “reasonable attempts” to comply, but had been thwarted by lack of finances and transportation); Buckins v. State, 789 So.2d 1184, 1186 (Fla. 4th DCA 2001) (holding that a probationer’s failure to attend a required program absent a showing that the failure was a product of a knowing and willful act and not merely the result of negligence or ineptitude could not support the revocation of the defendant’s probation); Thomas v. State, 672 So.2d 587, 588-89 (Fla. 4th DCA 1996) (holding that a probationer’s inept or negligent failure to return to a halfway house on time because of car trouble and his departure early the next morning to retrieve his car without first speaking to the program director because he was worried that his car would be towed did not amount to a willful violation of probation); Stevens v. State, 599 So.2d 254, 255 (Fla. 3d DCA 1992) (holding that the defendant’s act of missing a single meeting of a sex offender’s program despite his “quixotic and inept” attempts to make it there on time, “does not support the conclusion that the defendant willfully or deliberately missed the meeting”).
Community control is “a form of intensive, supervised custody in the community, including surveillance on weekends and holidays.” § 948.001(3), Fla. Stat. (2012); see also United States v. Wright, 607 F.3d 708, 715 (11th Cir.2010) (explaining that community control “contain[s] conditions specifically designed to rehabilitate the offender and promote respect for the law while simultaneously protecting the public.”). Despite the strict conditions imposed on the controlee, community control is not intended to be a punitive regime. Instead, like electronic monitoring, community control “helps the subject to conform his or her conduct to society’s requirements by discouraging behaviors that are likely to lead to new law violations or other violations of supervision.” Correa v. State, 43 So.3d 738, 745 (Fla. 2d DCA 2010). When confronted with a violation of the terms and conditions of community control that is both willful and substantial, the trial court certainly has the discretion to enter an order of revocation. However, community control should not function as a thinly disguised trap whereby the contro-lee’s slightest misstep results in revocation and a substantial prison term at the whim of the controlee’s community control officer.
In this case, when Mr. Filmore woke up late and was unable to reach his CCO’s office by telephone, he was faced with a difficult choice: commit a technical violation by performing the otherwise-authorized activity of picking up “the kids” outside of the agreed-upon hour, or avoid the technical violation by abdicating his personal and parental responsibilities to the children.[7] Under the circumstances in which he found himself, any fair-minded person would agree that Mr. Filmore made the responsible choice by leaving his apartment for a few minutes to pick up “the kids.” This behavior did not show an obstinate resistance to supervision or an obdurate refusal to conform to society’s reasonable expectations. Moreover, the *1195 State did not offer any evidence that Mr. Filmore had a pattern of failing to follow his schedule or provide any other examples of his violation of the conditions of his community control.
Finally, the trial court’s comment that “any time you are on probation for a first-degree felony punishable by life ... any violation is willful and substantial” is, standing alone, an abuse of discretion requiring reversal, because it applied a prohibited “per se” rule in revoking Mr. Fil-more’s community control.
Such a per se rule strips the trial court of its obligation to assess any alleged violations in the context of a defendant’s case. Trial courts must consider each violation on a case-by-case basis for a determination of whether, under the facts and circumstances, a particular violation is willful and substantial and is supported by the greater weight of the evidence. In other words, the trial court must review the evidence to determine whether the defendant has made reasonable efforts to comply with the terms and conditions of his or her probation.
See also State v. Carter, 835 So.2d 259, 261 (Fla.2002). As this court has previously observed:
In broadly declaring all terms of probation “serious,” the trial court seems to have believed revocation was automatically appropriate because a curfew violation had been proven. The trial judge made no findings on willfulness or sub-stantiality other than his blanket assertion that all curfew violations are “extremely serious.” This was an abuse of discretion because the trial court revoked [the probationer’s] probation without addressing the violation in the context of his case.
Brown, 86 So.3d at 1228. In this case, the trial court’s declaration that any violation is willful and substantial not only fails to address the violation in the context of all the facts and circumstances, it also deprives the concepts of willfulness and sub-stantiality of all meaning. The trial court’s failure to make any findings about the substantial nature of the violation bolsters our conclusion that Mr. Filmore’s alleged violations were not substantial.
V. CONCLUSION
Although “[t]here may arise instances where careless or negligent conduct of a probationer rises to the level of deliberateness,” Garcia, 701 So.2d at 609, under the specific facts presented in this case, we conclude that the State failed to prove-that Mr. Filmore’s violation was substantial and that he was unfit for community control. See Brown, 86 So.3d at 1227 (“[T]he decision to revoke a defendant’s probation should be made ‘only when the probation violation is both willful and substantial so as to indicate that probation will not work for that defendant.’ ” (quoting Carter, 835 So.2d at 262)). For these reasons, we conclude that the trial court abused its discretion in determining that Mr. Fil-more’s violations were substantial and in revoking his community control. Accordingly, we reverse the order of revocation of community control and the prison sentences imposed on Mr. Filmore. On remand, the trial court shall promptly restore Mr. Filmore to supervision.
Reversed and remanded with directions.
KELLY and BLACK, JJ., Concur.

. The State charged Mr. Filmore as a principal on all counts. The information specifically alleged that Mr. Filmore’s codefendant alone possessed the firearm and committed the overt acts constituting the crimes charged. The codefendant was convicted on all charged offenses in a jury trial and received sentences ranging from twenty to thirty-five years in prison on these charges. This background may explain the trial court’s initial decision to suspend Mr. Filmore's prison sentences and to impose a relatively short period of community control following his open plea.

. At the hearing, the witnesses referred to the mother of Mr. Filmore’s children both as his wife and as his girlfriend. We are unable to determine her status definitively from our record.

. During the hearing in the trial court, both the witnesses and the attorneys referred to this facility as "the center” without further explanation. Thus the record is ambiguous concerning whether this facility was a daycare center or if it only provided after-school care. Based on a few hints in the record, we are inclined to believe that it was the latter.

. Neither of the parties introduced the written schedule into evidence.

. This initial reference to a "bus stop” immediately morphed into references to "the center.” The same shift in terminology occurs in the parties’ appellate briefs. Neither party has addressed this inconsistency. More importantly, no one has suggested that Mr. Fil-more committed a violation of the terms of his community control by going to the center, as opposed to the bus stop, to retrieve "the kids.” We surmise that the children arrived at the apartment complex from school on a bus by mid-afternoon. If the children were not met by an adult at the bus stop, the children would go to the center, where they would wait until an adult came to retrieve them.

. Notably, the CCO never contacted anyone at the center to verify what Mr. Filmore and Mr. Campbell had told her.

. The latter choice suggests a variety of potential consequences. For example, what would happen to "the kids” if he did not pick them up on time? Would the center be available to him and his wife as a resource in the future? And, with regard to the alleged violation of the agreed-upon schedule, would it not have been a more severe breach to fail to pick up the children at all than to pick them up late?