**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————————

No. 24-11916

Non-Argument Calendar

————————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

PRESTON BUIE,

*Defendant-Appellant.*

————————————————

Appeal from the United States District Court
for the Southern District of Alabama
D.C. Docket No. 1:23-cr-00117-TFM-B-1

————————————————

Before ROSENBAUM, BRANCH, and ABUDU, Circuit Judges.

PER CURIAM:

Preston Buie was pulled over for following too closely behind a semi-truck. Within minutes, the officer who stopped him became suspicious that something criminal was afoot—he had

been warned to look out for a truck like Buie's, and Buie gave evasive and seemingly disingenuous answers to questions about the origins and purpose of his travel. Sure enough, a K-9 search called in by the officer revealed that Buie was transporting a dozen bricks of cocaine and a loaded handgun. Buie—already a felon at the time—was subsequently convicted by a jury of possession with intent to distribute cocaine; possession of a firearm in furtherance of a drug trafficking crime; and possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1).

Buie now appeals his convictions on two grounds: that the district court erred in (1) denying Buie's motion to suppress the evidence from the stop as obtained in violation of his Fourth Amendment rights, and (2) denying Buie's motion to dismiss his indictment for felon-in-possession because 18 U.S.C. § 922(g)(1) is facially unconstitutional under the Second Amendment to the U.S. Constitution. We affirm on both grounds.

## I.    BACKGROUND[1]

On the morning of January 12, 2023, Buie was driving a gray GMC Sierra pickup truck with North Carolina plates down Interstate 10 in Alabama. In the passenger seat, seatbelt secured, were an urn of ashes and a Holy Bible. Meanwhile, a sheriff's deputy was sitting on the same stretch of Interstate 10 on traffic

---

[1] Buie appeals the district court's pre-trial denial of his motion to suppress the evidence from the officer's search of his truck. As such, the facts in this section are drawn only from the evidence admitted at the suppression hearing, not from the evidence admitted at trial.

patrol.  At the time, the officer worked at the Mobile County Sheriff's Office for three years after having spent seventeen years as an officer with the Mobile Police Department.  As part of his drug interdiction duties, he routinely kept a lookout for out-of-state vehicles.  On this morning, the officer was especially on the lookout for a gray North Carolina-plated pickup truck, as U.S. border patrol's intelligence analyst had issued him a general alert that a truck matching that description may be transporting illegal drugs.

At 9:10 a.m., Buie and the officer's paths crossed.  Watching Buie drive past, the officer saw Buie violating Alabama's traffic laws by following too closely to the semi-truck in front of him.  The officer then pulled Buie over and began the traffic stop.

As Buie handed over his license and registration (but could not locate his proof of insurance), the officer first noticed Buie's urn and Bible.  The urn and bible caused the officer's "senses [to be] a little heightened," as the officer was aware that "traffickers will use props . . . to make their travel seem legitimate."  As the officer asked follow-up questions into Buie's purpose and travel plans, Buie told the officer that he was driving home to North Carolina to scatter his mother's ashes.  But not once in the multiple times the officer asked did Buie share where he was coming from.  Each time, Buie failed to answer and instead tried to change the topic of conversation.

While Buie rummaged around in his glove box to find his insurance documentation, the officer returned to his car to check

Buie's license and registration and call for a K-9 unit.  After confirming that Buie's license and registration were valid, the officer returned to Buie's truck.  Buie still had not located any proof of insurance, so while Buie continued his search, the officer asked Buie whether he had any illegal drugs or weapons in his truck. Without stopping his search, Buie responded that he did not.  The officer then asked if he could search Buie's truck.

Buie's demeanor, previously calm, changed dramatically. His body tensed, his breathing became heavy, and his hands began to shake "real bad" as he stared continuously at a piece of paper for "about thirty seconds."  Eventually, Buie "began to stutter" and denied permission for the search.

At this point, six minutes after the stop began, the K-9 unit arrived.  As the K-9 unit got ready, the officer prepared a traffic ticket for following too closely.  A couple of minutes later, the officer had Buie exit the truck to receive the ticket while the K-9 unit circled Buie's truck sniffing for drugs.  Having the subject exit his car was the officer's standard practice when conducting a K-9 search.  As the officer issued the ticket, the K-9 unit "did an alert on the vehicle," indicating that drugs were present.  The officer searched the truck and found twelve bricks of cocaine concealed under the rear seats of the truck and a loaded handgun hidden in the truck's center console.  The officer arrested Buie and seized the contraband.

Buie was indicted for possession with intent to distribute cocaine, possession of a firearm in furtherance of a drug trafficking

crime, and possession of a firearm by a felon. Before trial, Buie moved to exclude the evidence obtained from the search of his truck. Buie argued that the search violated his Fourth Amendment rights because the officer unlawfully prolonged the stop and thus the fruits of the K-9 search were unlawfully obtained. Buie also moved to dismiss Count 3 of his indictment—for possessing a firearm as a felon—as an unconstitutional infringement of his right to keep and bear arms.

The district court denied both motions. As to the search, it found that the officer developed reasonable suspicion as the traffic stop progressed, beginning with the border patrol's alert and culminating with Buie's suspicious behavior following the officer's request to search his truck, which justified any delays and the subsequent search. In making this ruling, the judge found the officer's testimony credible and truthful. As to Buie's Second Amendment claim, the district court, citing the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008) and prior precedents of this Court, held that restrictions on felons possessing firearms did not violate the Second Amendment to the U.S. Constitution.

Buie was subsequently convicted on all three counts. This appeal followed.

## II.    STANDARD OF REVIEW

"A district court's denial of a motion to suppress involves mixed questions of law and fact." *United States v. Braddy*, 11 F.4th 1298, 1307 (11th Cir. 2021). We review the district court's findings

of fact for clear error and the application of law to those facts *de novo*. *Id*. We grant substantial deference to both the explicit and implicit credibility determinations of the district court acting as factfinder, construing all facts in the light most favorable to the prevailing party in the district court. *United States v. Lewis*, 674 F.3d 1298, 1303 (11th Cir. 2012).

We review the constitutionality of a statute *de novo*. *United States v. Wright*, 607 F.3d 708, 715 (11th Cir. 2010).

## III.    DISCUSSION

Buie raises two issues on appeal. First, that the district court erred in denying his motion to suppress the evidence obtained from the officer's search of his truck. Second, that his conviction for possessing a firearm as a felon should be set aside because 18 U.S.C. § 922(g)(1) is facially unconstitutional as a violation of the Second Amendment. We examine each argument in turn.

### A.  The Fourth Amendment

A traffic stop constitutes a seizure within the scope of the Fourth Amendment. *Heien v. N.C.*, 574 U.S. 54, 60 (2014). When a police officer makes a lawful traffic stop, the officer can conduct checks unrelated to the stop so long as he does not prolong the stop. *Braddy*, 11 F.4th at 1310. Any delay unrelated to the stop's traffic-related mission unlawfully prolongs the stop. *United States v. Campbell*, 26 F.4th 860, 884 (11th Cir. 2022) (en banc); *Rodriguez v. United States*, 575 U.S. 348, 352 (2015) (holding that the length of the delay is immaterial). Nor can an officer evade this rule by

working diligently to make time for himself to "slip in a few unrelated questions." *Campbell*, 26 F.4th at 884.

Here, Buie locates the point that his Fourth Amendment rights were violated as the point at which the officer "call[ed] for the dog sniff unit and detain[ed] Mr. Buie to ask questions related to potential drug activity *before* he had reasonable suspicion of such activity." In other words, Buie argues that the officer's call for K-9 backup and subsequent questioning delayed the stop.[2]

The officer did not prolong the stop by calling the K-9 unit. When he called the K-9 unit, the officer had only asked questions and taken actions which were "ordinary inquiries incident to a traffic stop." *Id.* at 882. He had pulled Buie over for an undisputed traffic violation, obtained Buie's license and registration, and asked questions about Buie's origin and destination (*i.e.*, his travel plans). *Id.* at 882, 885. Then, because Buie was having difficulty locating his proof of insurance, the officer returned to his car to give Buie time to find it while the officer ran his license and registration. And Buie could not locate his insurance by the time the officer returned to Buie's truck after validating the license and registration. It was during the delay caused by Buie's search that the officer called for the K-9 unit. To be sure, calling a K-9 unit was not an "ordinary inquir[y] incident to a traffic stop." *Id.* at 882 (quotations omitted). But, even if the officer had not called for the K-9 unit, the length of the stop would have been identical. *Id.* ("Unrelated inquiries are

---

[2] Buie does not challenge, and thus concedes, the lawfulness of the stop until the officer calls the K-9 unit.

permitted so long as they do not add time to the stop.")  Thus, although the officer deviated from the traffic enforcement mission of the stop it is an "unrelated check[]" permitted by this Court's and the Supreme Court's caselaw. *Braddy*, 11 F.4th at 1310.

Buie's argument that the officer prolonged the stop by asking two questions—if Buie was transporting contraband and if the officer could search his truck—also fails.  In evaluating the length of a traffic stop, "courts must look at what an officer *actually* does," without conflating the subject's decisions with those of the officer. *Campbell,* 26 F.4th at 883-84 (emphasis added); *Rodriguez*, 575 U.S. at 357 (holding that "diligence [is] gauged . . . by noting what the officer actually did and how he did it.").  As such, both our jurisprudence and that of the Supreme Court put the entire focus on the officer's actions.[3]

In this case, when the officer returned to Buie's truck after running his license and registration and calling for the K-9 unit, Buie was still searching for his proof of insurance.  It was while Buie continued his search that the officer asked his two questions.  The first question was asked and answered while Buie continued his

---

[3] In *Campbell*, the focus was on the officer's decision to ask unrelated questions after the traffic stop had concluded and the officer was about to issue a ticket. 26 F.4th at 885.  In *Rodriguez*, the focus was on the officer's decision, after a ticket had already issued, to cause the subject to wait for seven or eight minutes while he called for and conducted a dog sniff. 575 U.S. at 351-52.  And the Supreme Court in *Rodriguez*, in admonishing officers that they cannot work expeditiously to earn bonus time for an unrelated investigation, kept the focus on the officer's actions, not the subject's. *Id*. at 357.

search for his proof of insurance. The second question was also asked while Buie's search was ongoing. Thus, when the second question was asked, the stop had not been delayed by even a second.

After the second question was asked, Buie caused a delay. In response to the officer's second question, Buie froze, stopped searching, and delayed his denial of permission to search for "about thirty seconds" while he stared continuously at a piece of paper. To be sure, Buie's freeze after the second question halted his search. But our focus is on what the officer actually did; we do not hold the officer accountable for all events occurring during the traffic stop regardless of their cause. Here, the officer asked questions while Buie was simultaneously occupied with a search that was integral to the ongoing traffic stop, and the officer did not obligate Buie to hesitate and delay his answer. Instead, Buie's 30 second hesitation while responding belongs to him. Thus, holding the officer accountable only for his own actions, we find that absent the two challenged questions, the stop would still have been the exact same length.

Buie's comparison to the impermissible delay in *Campbell* is therefore inapposite. Buie argues that just like in *Campbell*, the officer's questions of Buie were about the presence of contraband and were "fairly obviously . . . unrelated to a traffic stop [for following too closely." 26 F.4th at 885. Buie then argues that these questions caused an over 30 second delay for which the officer lacked reasonable suspicion. But this case is materially different

than *Campbell*. In *Campbell*, the officer's impermissible questions occurred at the end of the traffic stop while the subject waited to have his ticket issued, and the deviation caused the traffic stop to be delayed by 25 seconds over the length of the stop without the questions. 26 F.4th at 885. In contrast, here the questions at issue came as Buie was trying to locate his proof of insurance. Put simply, this is not a scenario where the officer was trying to engineer the stop so as to "slip in a few unrelated questions" while the subject waited on the officer to do his duty, but instead one where the officer asked his questions while waiting on Buie. *Id.* at 884.

Thus, we agree with the district court that the officer did not impermissibly delay Buie's traffic stop, and Buie's Fourth Amendment rights were not infringed.

## B.  *The Second Amendment*

We now turn to Buie's second and final argument—whether the federal felon-in-possession statute, 18 U.S.C. § 922(g)(1),[4] is facially a violation of the Second Amendment. It is not.

The Second Amendment guarantees that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const.

---

[4] The federal felon-in-possession statute prohibits "any person who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g)(1).

24-11916                Opinion of the Court                11

amend. II.  The Supreme Court has made clear that this guarantee is not unlimited, "just as the First Amendment's right of free speech [is] not." *Id.*, at 595.  Crucially, and relevant here, the Court emphasized that "nothing in [*Heller*] should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons . . . ." *Id.* at 626.  Later, in *United States v. Rozier*, we relied on *Heller* to hold that § 922(g)(1) did not violate the Second Amendment.  598 F.3d 768, 770 (11th Cir. 2010).  We stated that *Heller* suggested that "statutes disqualifying felons from possessing a firearm under any and all circumstances do not offend the Second Amendment." *Id*. at 771.

Despite the above, Buie argues not only that *Heller's* admonition is "conclusory dicta," but that the Supreme Court's subsequent decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), abrogates *Rozier* and its progeny, and instead renders § 922(g)(1) unconstitutional because it lacks a historical analogue.

This argument misinterprets the Supreme Court's Second Amendment caselaw, as this Court recently made clear in *United States v. Dubois*, 139 F.4th 887, 892 (11th Cir. 2025).  "*Bruen* did not abrogate *Rozier*[;]" nor did the Supreme Court do so in *United States v. Rahimi,* 602 U.S. 680 (2024).  *Dubois*, 139 F.4th at 893.  The Court in *Bruen* made clear that its holding was "[i]n keeping with *Heller*," 597 U.S. at 17, and *Heller*'s "'holding did not cast doubt' on felon-in-possession prohibitions," *Dubois*, 139 F.4th at 893 (quoting *McDonald*, 561 U.S. at 786.)  *Rahimi* was even more explicit than

*Bruen*, as there the Supreme Court "endorsed *Heller*'s understanding that prohibitions 'on the possession of firearms by felons and the mentally ill . . . are presumptively lawful.'" *Dubois*, 139 F.4th at 892 (quoting *Rahimi*, 602 U.S. at 699) (further quotation omitted).  Therefore, "*Rozier* remains good law," *Dubois*, 139 F.4th at 893, and Buie's facial challenge to the constitutionality of 18 U.S.C. § 922(g)(1) fails.

## IV.    CONCLUSION

Consistent with our analysis above, we hold that Buie's Fourth Amendment rights were not violated and 18 U.S.C. § 922(g)(1) is constitutional.

**AFFIRMED.**