[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-13822

_____

Docket Nos: 2:10-cv-01106-JA-WC; 2:03-cr-00259-WKW-WC-1


LEON CARMICHAEL, SR.,

Petitioner-Appellant,

versus

UNITED STATES OF AMERICA,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

(July 22, 2020)


Before WILSON, NEWSOM, Circuit Judges, and PROCTOR,* District Judge.

---

* Honorable R. David Proctor, United States District Judge for the Northern District of Alabama, sitting by designation.

PROCTOR, District Judge:

Leon Carmichael is a federal prisoner serving a 480-month sentence. This appeal is from a district court's denial of his 28 U.S.C. § 2255 motion asking that his sentence be vacated. After conducting an evidentiary hearing on Carmichael's habeas petition, the district court found that his counsels' performance fell below minimum constitutional standards. However, the court also determined that, although there was deficient performance, Carmichael was not entitled to relief because he did not show prejudice. Carmichael challenges that ruling. After careful review, and with the benefit of oral argument, we affirm.

I.    Background

A.    Carmichael's Conviction, Sentence, Section 2255 Motion, and Initial Appeal

In August 2004, a grand jury returned a third superseding indictment charging Carmichael with: (1) conspiring to distribute 3,000 or more kilograms of marijuana, in violation of 21 U.S.C. § 846; and (2) conspiring to commit money laundering, in violation of 18 U.S.C. § 1956(h). Carmichael went to trial on these charges in 2005. On June 17, 2005, following an eleven-day trial, a jury found him guilty of conspiring to distribute 7,000 pounds, or more, of marijuana and also convicted him on a money laundering conspiracy charge.

The district court sentenced Carmichael to a total term of imprisonment of 480 months. In addition to the prison sentence, the court ordered Carmichael to

2

forfeit the Carmichael Center,[1] his personal residence, and an automobile.

Carmichael filed a direct appeal. This Court affirmed his convictions and sentences

in 2009. See United States v. Carmichael (Carmichael I), 560 F.3d 1270 (11th Cir.

2009). The Supreme Court denied his petition for a writ of certiorari. See

Carmichael v. United States, 558 U.S. 1128 (2010).

On December 30, 2010, Carmichael filed a pro se 28 U.S.C. § 2255 motion

to vacate his conviction and sentence. In his Motion, Carmichael raised numerous

claims. Relevant to this appeal, he contends that when he was deciding whether to

plead guilty or proceed to trial, his attorneys failed to: (1) explain to him the

weight and extent of the government's evidence; (2) advise him of the applicable

sentence he could face, if convicted; (3) properly pursue plea negotiations with the

government; and (4) concurrently convey plea offers made by the government.

Initially, a Magistrate Judge issued a report and recommendation ("R&R")

recommending denial of Carmichael's section 2255 motion on the merits. Over

Carmichael's objections, the district court judge adopted the R&R and denied his

section 2255 motion. We reversed and remanded the case to the district court with

instructions that it conduct an evidentiary hearing on Carmichael's ineffective

assistance of counsel claim. See Carmichael v. United States (Carmichael II), 659

---

[1] The Carmichael Center was an entertainment venue owned by Carmichael.

F. App'x 1013 (11th Cir. 2016).

B.    The Evidentiary Hearing

On remand, the district court conducted an evidentiary hearing. Carmichael testified at the hearing, as did two of the lawyers who represented him at trial, Marion Chartoff and Susan James.[2] The government presented the testimony of three witnesses: two Assistant U.S. Attorneys (Stephen Feaga and Anna Clark Morris), and the Chief of the Criminal Division of the U.S. Attorney's Office (Louis Franklin). Carmichael's primary arguments at the evidentiary hearing focused on his attorneys' alleged deficient performance regarding plea negotiations and communication of plea offers. As such, it was necessary for the district court to hear evidence about the lawyers who defended Carmichael in the criminal action.

Carmichael employed at least twelve attorneys between the time he was first indicted in 2004 and the affirmance of his conviction on direct appeal in 2009.[3] See Carmichael I, 560 F.3d at 1270. Carmichael initially hired criminal defense attorney Stephen Glassroth to serve as lead counsel. In turn, Glassroth selected a

---

[2] In assessing the argument raised in this appeal, the Court focuses its analysis on the attorneys who played an active part in Carmichael's defense, including Stephen Glassroth, Lisa Wayne, Susan James, and Marion Chartoff. The Court does not, for example, discuss the performance of Attorney Wesley Pitters, who filed a notice of appearance when Carmichael was indicted, but withdrew several months later.

[3] The record does not indicate the precise duties that these twelve attorneys undertook.

team of attorneys, including Chartoff, to perform research and draft motions. Glassroth also tapped Lisa Wayne, a well-known criminal defense attorney from Denver, Colorado, who Glassroth viewed as a prominent attorney. Carmichael urged Glassroth to work with Susan James, but he says Glassroth refused. According to Carmichael, Glassroth's trial strategy was to argue that a rogue Drug Enforcement Agency ("DEA") agent unfairly targeted Carmichael.

Carmichael never admitted guilt to any of his numerous attorneys, but he did ask Glassroth early in the proceedings about the possibility of entering a plea. Glassroth responded by telling Carmichael he thought the best strategy was not to discuss a plea deal until discovery was complete.

Before trial, Glassroth withdrew from the case. Wayne offered to remain in the case, but did so on the condition that Carmichael name her lead counsel. After Glassroth's departure, Carmichael hired James along with Ronald Brunson. Brunson was specifically tasked with defending Carmichael on the money laundering charge.

The testimony offered at the evidentiary hearing revealed that Carmichael's legal team was, at best, dysfunctional. Wayne, as lead counsel, refused to take direction from James, and the lawyers did not communicate with each other. Chartoff described the team, under Wayne's leadership, as a "disaster" and "a rudderless ship." The evidence indicates Carmichael's legal "team" was a team in

5

name only.

Prior to trial, Carmichael testified that he asked Wayne to pursue settlement negotiations. Wayne agreed to do so when she arrived in Alabama for trial, but she remained in Colorado until the eve of trial. Carmichael claims he had difficulty getting in contact with her before she finally arrived in Alabama. There is no evidence that Wayne ever pursued a plea agreement.

Assistant U.S. Attorney ("AUSA") Stephen Feaga, who joined the government's trial team some four to six weeks before the start of trial, testified on behalf of the government at the evidentiary hearing. At the start of Carmichael's trial, it was Feaga's understanding that some level of plea discussions had taken place, but were not fruitful. Specifically, Feaga believed the government had previously proposed that Carmichael receive a twenty-year sentence in exchange for agreeing to plead guilty, forfeiting the Carmichael Center, and providing substantial assistance to the government. Feaga was under the impression that the offer had been rejected by one of Carmichael's lawyers—but he did not know which one. In their testimony, neither James nor Chartoff referenced such a proposal. On cross-examination, Feaga conceded he had no specific knowledge that an offer had actually been conveyed.

Feaga further testified that he spoke with James about a potential plea agreement prior to trial. James confirmed this was a "Hail Mary" attempt to settle

6

the case. While talking with Feaga, James suggested Carmichael would be willing to accept a five-year sentence. Feaga conveyed that proposal to his superiors, but it was immediately rejected. Rather, Feaga's superiors authorized him to deliver a counter-proposal—if Carmichael entered a guilty plea, forfeited the Carmichael Center, and provided "super cooperation,"[4] he could receive a sentence as low as ten years. Alternatively, if Carmichael was unwilling or unable to provide "super cooperation," the government would recommend a twenty-year maximum sentence if Carmichael merely provided the government with substantial assistance that was truthful. Consistent with these discussions, Feaga submitted an affidavit indicating the government was initially willing to enter into a plea agreement with a recommendation that the sentence not exceed twenty-years, but he later discussed with counsel that the agreement could provide for a sentence as low as ten years, if the level of cooperation Carmichael provided was extraordinary.

At the hearing, James's testimony was equivocal at best. Astonishingly, she had no specific recollection of relaying this information to Carmichael, and, after reviewing her notes, stated that she did not think she did so. James tried to justify this lapse by stating she believed Carmichael had initially been resistant to the idea of forfeiting the Carmichael Center, and therefore she "might have consciously just

---

[4] Feaga testified that by "super cooperation" he actually meant the delivery of information and testimony that led to the successful prosecution of others.

kind of blown [that plea proposal] off."

Feaga had a starkly different account than James. He recalled James telling him that Carmichael rejected the proposal. Moreover, two other members of the U.S. Attorney's Office similarly testified that they understood Carmichael had rejected the offer. At the evidentiary hearing, Carmichael testified that the offer was not relayed to him, and had he known about the ten-year "super cooperation" offer, he would have accepted it. But, apart from this conclusory claim, Carmichael gave no specific testimony about either his willingness or ability to testify, or to otherwise provide such high-level cooperation. Nor did he state that he would have accepted the alternative twenty-year offer.

Carmichael also testified that it was his belief—based on a comment by trial counsel that he claims to have overheard—that the government made a plea offer during trial while the jury was deliberating. Carmichael stated that the next time he was informed of a plea proposal was on the day of the forfeiture hearing. He did not provide any more specifics than that.

Carmichael testified that not one of his numerous attorneys informed him of his guideline range or the possibility that he could receive a sentence of life imprisonment without parole. Carmichael further testified that the first time he became aware he could be sentenced to more than twenty-years was when the presentence investigation report came out. Further, on cross-examination,

8

Carmichael admitted that when he appeared before a Magistrate Judge after his indictment, and on each superseding indictment, the Magistrate Judge informed him of the minimum and maximum penalties he faced if convicted. But, as his own counsel acknowledged at oral argument, Carmichael learned in a post-trial meeting with Feaga that he was looking at a significant sentence.

Carmichael further testified that he was visited in jail by Feaga, after the trial that resulted in his conviction, but before his sentencing. According to Carmichael, Feaga wanted to discuss capping Carmichael's total sentence at twenty years in exchange for his testimony against a co-conspirator. Although James set up the meeting at Feaga's request, none of Carmichael's attorneys were present. After Feaga discussed a possible deal with him, Carmichael told Feaga he would take his chances at appeal. Thereafter, Carmichael shopped the idea of an offer with three of his attorneys: James, Chartoff, and Jim Jenkins (his appellate attorney). Carmichael testified that both James and Jenkins advised him not to take a twenty-year deal. James told Carmichael he should decline the proposal because, in her opinion, Judge Thompson (the sentencing judge) was not likely to sentence him to more than twenty-years, in any event. Jenkins advised Carmichael to decline due to his age. However, Chartoff recommended pursuing a deal. After two months passed, Carmichael authorized Chartoff to find another lawyer to negotiate with Feaga, but by that time the proposal had been withdrawn.

Feaga also testified about his meeting with Carmichael after the trial. According to Feaga's testimony, Carmichael wanted to discuss the possibility of a ten-year sentence, but at that point that deal was off the table. However, Feaga told Carmichael that capping his total sentence at twenty-years might still be possible, so long as he could provide adequate cooperation. Feaga also told Carmichael that while the ten-year proposal had been withdrawn, a ten-year deal was still conceivable, depending on the quality of the information he provided. Carmichael told Feaga he would take his chances on appeal.

AUSA Morris and AUSA Franklin also testified at the hearing. Morris was involved in the pre-trial plea discussions that occurred between Feaga and James. Morris's testimony confirmed that Carmichael's attorney, James, ultimately did not accept the pre-trial deals offered by the government.

Franklin testified that he supervised the government attorneys working on Carmichael's prosecution. He recalled that the U.S. Attorney rejected James's "Hail Mary" request for a five-year deal. Franklin also testified that the government could not make an official offer unless Carmichael was willing to meet with the prosecution and make a proffer. Once a proffer was made, the government would evaluate the information provided by Carmichael and be in a position to make a more formal offer. Franklin stated that Wesley Pitters, one of Carmichael's friends and an attorney who briefly appeared in the case, told him

10

that Carmichael rejected the idea of making a proffer. Similarly, Feaga and Franklin both testified that Carmichael refused to proffer without a guaranteed sentence, both pre-trial and after his conviction.

Carmichael maintained his innocence throughout trial and the post-conviction proceedings. However, on cross-examination, Carmichael testified that if he had known he was potentially facing a life sentence, he would have pleaded guilty in return for a ten-year sentence.

C.    The District Court's Findings and Conclusions

After the evidentiary hearing, the district court denied Carmichael's section 2255 motion. The district court divided its analysis of Carmichael's ineffective assistance of counsel claims into four parts: (1) counsels' collective failure to explain to Carmichael the weight and extent of the government's evidence prior to trial; (2) counsels' failure to advise him, if convicted, about the applicable sentence he would face; (3) counsels' failure to pursue plea negotiations; and (4) counsels' failure to convey plea offers from the government.

First, as to the failure of counsel to explain the weight and extent of the government's evidence prior to trial, the district court found this assertion was not supported by the hearing evidence. Specifically, the court noted that "James testified that she took it upon herself to search for information that could be used to impeach [g]overnment witnesses and that she frequently updated Carmichael on

11

her investigation and discussed with him what testimony the witnesses would likely give." Although Carmichael claims he did not speak with James on a daily basis, he did not deny that she frequently updated him on the evidence against him. Similarly, Carmichael could not recount a specific instance in which he requested information regarding the government's case and James did not respond to the request. The court also stated that "[a]ny notion that [Carmichael] was not aware of the situation is belied by his background and conduct . . . . [H]e hired a dozen lawyers to defend him and claims to have paid almost a million dollars in fees. Carmichael was consumed by this case; he understood that the maximum sentence if he were convicted was life."

Second, as to counsels' failure to advise Carmichael of his sentencing exposure, the district court determined that counsel did not sufficiently discuss the topic with him. Specifically, the district court found not only that Carmichael was unfamiliar with the sentencing guidelines, but also that his counsel failed to advise him how the guidelines would apply in his case and what his likely guideline range would be. As the district court noted, "[e]ach time [he] was arraigned on the four consecutive indictments, the [M]agistrate [J]udge advised him of the applicable minimum and maximum sentences." In particular, "Carmichael remembers that when he was arraigned for the crimes of conviction, the [M]agistrate [J]udge told him the charges carried a possible life sentence and a minimum sentence of ten

12

years." However, the district court noted that "although the [M]agistrate [J]udge advised [Carmichael] that he could be sentenced from [ten-]years to life, he had no idea what his guideline score would be." Astoundingly, the testimony of Chartoff and James corroborated Carmichael's assertions. After hearing the evidence, the court concluded that counsels' collective failure to discuss sentencing possibilities under the guidelines with Carmichael was deficient practice.

Third, as to counsels' failure to pursue plea negotiations, the court found that Wayne's failure to broach the possibility of a plea agreement was deficient performance.[5] The court noted that "[o]nce Wayne took over as lead counsel, Carmichael asked her to settle the case. Wayne responded that she would pursue a settlement when she came to Montgomery, but she did not come until just before trial, and there is no evidence she ever pursued a plea agreement." The court found that Wayne's performance was deficient because she failed to attempt to negotiate a plea agreement despite Carmichael specifically directing her to do so.

Finally, as to counsels' failure to convey plea offers, the court concluded there was insufficient evidence presented to support a finding that any plea offer was made prior to Feaga joining the team. Similarly, the court found that there was

---

[5] The district court further found that "[i]t is not clear [whether] Glassroth was deficient in suggesting to Carmichael that they wait until discovery was complete to pursue a plea offer. There may have been good reasons for waiting. It is impossible to know whether, once armed with discovery, Glassroth would have pursued plea negotiations, because he withdrew from the case and did not testify at the evidentiary hearing."

insufficient evidence that a possible plea agreement was discussed during trial while the jury was deliberating. However, the court found that James's pre-trial "Hail Mary," which resulted in a counteroffer[6] from Feaga, obligated James to inform Carmichael of the discussions. The court found that James's failure to communicate Feaga's counteroffer constituted deficient performance.

Importantly, in its analysis, the district court treated Feaga's proposal as two separate offers: (1) a ten-year deal for "super cooperation;" and (2) a twenty-year deal for other useful information.[7] In regard to the first, ten-year deal, the court noted that it was unclear whether Carmichael could have provided the necessary extraordinary level of cooperation. As to the second, the twenty-year proposal, the court found that Carmichael failed to offer any evidence that he would have accepted that offer as presented. Although the district court found counsels' performance was deficient, it concluded that Carmichael was not entitled to relief

---

[6] The district court found the counteroffer outlined two possibilities for Carmichael: "(1) a guilty plea to unspecified offenses, forfeiture of the Carmichael Center, and if Carmichael provided 'super cooperation,' the possibility of a sentence as low as ten years; or (2) a guilty plea to unspecified offenses, and with Carmichael's acceptance of responsibility, a sentence not to exceed twenty years."

[7] At oral argument, Carmichael's appointed counsel acknowledged that Feaga's proposal, properly viewed, is a single offer that existed on a sliding scale, depending on his level of cooperation. That is, Carmichael's counsel characterized the offer as one for a twenty-year recommendation with a chance to reduce the sentence down to ten years if Carmichael provided super cooperation. We think that is the correct characterization, but we do not believe the district court's different, binary treatment of the proposal makes a material difference here. For ease of reference, we analyze the offer as the district court did: a proposal involving two separate offers, one contemplating a ten-year sentence if Carmichael provided super cooperation; and a second involving a twenty-year proposal if he only provided useful information.

14

under section 2255 because he could not show prejudice. Specifically, Carmichael failed to present evidence indicating that he would have accepted either of Feaga's proposals.

After the district court denied Carmichael's section 2255 motion, he filed a timely pro se notice of appeal. At Carmichael's request, a judge on this Court granted a certificate of appealability ("COA") on the following issue:

> Whether the district court erred in denying Carmichael's claim that he would have pleaded guilty if trial counsel had advised him of his likely sentencing exposure under the Sentencing guidelines, pursued the possibility of a plea deal earlier in the process, and advised him of the government's informal plea offers.

Appellate counsel was appointed to represent Carmichael on this appeal. [8]

II.    Standard of Review

In an appeal from a section 2255 proceeding, we review legal conclusions de novo and factual findings for clear error. Devine v. United States, 520 F.3d 1286, 1287 (11th Cir. 2008) (per curiam). Ineffective assistance of counsel claims present some mixed questions of law and fact that we review de novo. Id.

Pro se filings are generally held to a less stringent standard than those drafted by attorneys and are liberally construed. Tannenbaum v. United States, 148 F.3d 1262, 1263 (11th Cir. 1998).

---

[8] Appointed counsel did not submit briefing for consideration by this Court. At oral argument, counsel affirmed his intent to rest on the briefing filed pro se by Carmichael.

III.    Analysis

To prevail on his ineffective assistance of counsel claim, Carmichael must satisfy the familiar two-part test established in Strickland v. Washington, 466 U.S. 668, 687 (1984). See Rosin v. United States, 786 F.3d 873, 877 (11th Cir. 2015). A habeas petitioner claiming ineffective assistance of counsel must carry his burden on both Strickland prongs, and a court need not address both prongs if the petitioner has made an insufficient showing on one of those elements. Johnson v. Alabama, 256 F.3d 1156, 1176 (11th Cir. 2001).

Under the first prong of Strickland, counsel's performance is deficient if it falls below an objective standard of reasonableness and is "outside the wide range of professionally competent assistance." Johnson v. Sec'y, DOC, 643 F.3d 907, 928 (11th Cir. 2011) (quoting Strickland, 466 U.S. at 688, 690) (internal quotations omitted). Courts must indulge the "strong presumption" that counsel's performance was reasonable. Jennings v. McDonough, 490 F.3d 1230, 1243 (11th Cir. 2007) (quoting Strickland, 466 U.S. at 689). As a result, a petitioner must show that "no competent counsel would have taken the action that his counsel did take." Chandler v. United States, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc).

Here, regarding the first Strickland prong, the parties do not dispute the district court's finding that counsels' performance was deficient due to their failure to: (1) communicate Carmichael's potential total sentence and the application of

16

the sentencing guidelines; (2) seek a negotiated plea (as Carmichael requested); and (3) relay to him the plea offers that Feaga and James discussed. This Court agrees.

As for Strickland's prejudice prong, Carmichael must show a reasonable probability that, but for counsels' unprofessional errors, the result of the proceedings would have been different. Lafler v. Cooper, 566 U.S. 156, 163 (2012). We have clarified that a "reasonable probability" is a "probability sufficient to undermine confidence in the outcome." Osley v. United States, 751 F.3d 1214, 1222 (11th Cir. 2014).

The Supreme Court has long recognized that Strickland's two-part inquiry applies to ineffective assistance of counsel related to the plea process. See Hill v. Lockhart, 474 U.S. 52, 57 (1985). In Missouri v. Frye, 566 U.S. 134 (2012), and Lafler, the Court clarified that the Sixth Amendment right to the effective assistance of counsel extends specifically "to the negotiation and consideration of plea offers that lapse or are rejected." In re Perez, 682 F.3d 930, 932 (11th Cir. 2012) (per curiam). In the plea-negotiation context, the prejudice requirement focuses on whether counsel's unconstitutionally ineffective performance adversely affected the outcome of the plea process. Hill, 474 U.S. at 59.

Where a petitioner raises an ineffective assistance claim asserting that his counsel was deficient in plea discussions, to demonstrate prejudice he must show

17

that, but for the ineffective assistance of counsel, a reasonable probability existed that: (1) the plea offer would have been presented to the court (i.e. the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances); (2) the court would have accepted its terms; and (3) under the offer's terms, the conviction or sentence, or both, would have been less severe than under the judgment and sentence that were, in fact, imposed. Lafler, 566 U.S. at 164; see Frye, 566 U.S. at 149-50 (stating that a defendant whose counsel failed to communicate a plea offer to him must show not only "a reasonable probability that he would have accepted the lapsed plea but also a reasonable probability that the prosecution would have adhered to the agreement and that it would have been accepted by the trial court.").

Here, in applying Strickland's second prong, the district court concluded that Carmichael failed to show he was prejudiced by his counsels' failures. The second and third prejudice prongs are not at issue here. As the district court found in regard to prong two, there is no record evidence indicating that the offers would have been withdrawn prior to trial. In regard to prong three, the ten and twenty-year offers are clearly less severe than the forty-year total sentence actually received by Carmichael. Thus, the only issue before this Court is whether the district court erred in determining that the habeas hearing evidence did not establish Carmichael would have accepted either the ten-year or twenty-year plea

18

offers if counsel had performed reasonably.

A.    The Ten-Year Proposal

Under the offer made to his counsel, to earn a ten-year recommendation from the government, Carmichael would have had to enter a guilty plea to unspecified offenses, agree to forfeit the Carmichael Center, and provide "super cooperation." Importantly, this ten-year super cooperation proposal would have required Carmichael to go above and beyond providing mere substantial assistance. That is, Feaga testified that super cooperation from Carmichael would entail more than just providing full details of his criminal activities (which he would have been required to provide in connection with either deal). Rather, super cooperation required Carmichael to give information and testimony that could lead to the indictment and prosecution of other people. To be clear, this proposal involved Carmichael working his sentence down to ten years. And, even if he had provided such high-value cooperation, ten years was not a guarantee.

After conducting a full evidentiary hearing, the district court found that Carmichael "offered no evidence that he would have—or, even could have—given substantial assistance," much less super cooperation. The court stated, "[w]ith so little information in the record, it is impossible to know whether Carmichael could have satisfied the [g]overnment's requirements to file a motion under [section] 5K1.1 of the United States Sentencing Guidelines for a downward departure from

19

the advisory guideline range."

In particular, the district court found as follows:

But Carmichael did not show that he would have entered into a plea agreement with the Government based on Feaga's proposals. The ten-year proposal called for Carmichael to provide substantial assistance—what Feaga referred to as "super cooperation." Because of the informality of the relevant discussion between Feaga and James, it is not clear what the Government had in mind by "super cooperation." In his testimony, Carmichael made fleeting reference to Franklin's interest in prosecuting a police lieutenant, but this is the only evidence bearing on the performance expected of Carmichael in return for the Government taking action to reduce his sentence. With so little information in the record, it is impossible to know whether Carmichael could have satisfied the Government's requirements to file a motion under § 5K1.1 of the United States Sentencing Guidelines for a downward departure from the advisory guideline range. Because the ability to seek a reduction of sentence under U.S.S.G. § 5K1.1 is solely within the discretion of the Government, perhaps Carmichael should be entitled to some latitude in showing that he would have accepted an offer including a substantial assistance requirement. But he offered no evidence that he would have—or, even could have—given substantial assistance. When Franklin broached the subject of a proffer, Carmichael refused to speak to the Government without a guarantee of a specific sentence.

The district court honed in on the weaknesses in Carmichael's prejudice assertion.

First, the informality of the discussion between Feaga and James left it unclear

exactly what the terms of the "offer" were, much less whether Carmichael was

willing and able to satisfy those terms. In other words, it is not clear: (1) what

extraordinary assistance Carmichael would have had to furnish in order to work his

way down to a ten-year recommendation; (2) whether he was willing to supply that

high level of cooperation; or (3) even, assuming his willingness, if he would have

20

been able to do so. Indeed, Carmichael's single, unspecific, fleeting reference to the government's interest in a police lieutenant is the only evidence in the record regarding the performance expected of him in return for the government recommending a reduction in his sentence. Like the district court, we are left to speculate, at best, as to whether Carmichael could have provided super cooperation with respect to that police officer, and whether he would have been willing to do that.

There are strong indications in the record that Carmichael was not so willing. For example, Carmichael's assertion that he would have accepted a ten-year deal is undermined by his refusal to speak with the government when Franklin broached the subject of a proffer. Carmichael refused to provide a proffer unless he was guaranteed a particular sentence on the front end. His refusal to proffer (without a promise of a guaranteed sentence) <u>after</u> he was convicted contradicts his testimony that he would have accepted a ten-year deal (and, for that matter, the twenty-year deal) prior to trial. Further, his position ignores a stark reality in criminal litigation. The government does not guarantee a reduced sentence before it knows the extent of a defendant's cooperation. That is simply not the way the process works. <u>Osley v. United States</u>, 751 F.3d 1214, 1223-24 (11th Cir. 2014) (finding that a petitioner's "unwillingness to accept a plea that offered the prospect of spending fewer than five years in prison utterly undercuts his claim that he

21

would have accepted a deal that involved a fifteen-year mandatory minimum, yielding a term of imprisonment at least three times as large.").

In Osley, we found that a defendant failed to establish prejudice despite his argument that he would have pleaded guilty if his attorney had correctly informed him of his sentencing exposure. Id. at 1221-23. Although we had "serious doubts" about Osley's counsel's performance, we concluded that he failed to establish a reasonable probability that he would have accepted a plea agreement had his counsel informed him of his sentencing exposure. Id. at 1223. Osley turned down a plea agreement that would have recommended a sentencing range of only 70 to 87 months. He was told that he might serve less time with good behavior or a government motion to reduce the sentence. Id. at 1221-23. The district court found that Osley's unwillingness to accept that offer "utterly undercut" his claim that he would have pleaded guilty if he had been aware of the fifteen-year mandatory minimum. We affirmed that finding. Id. at 1224.

The same is true here. The record evidence strongly indicates that, even if his counsel had presented Carmichael with a plea offer and explained his sentencing exposure, he still would have chosen to take his chances at trial. See Id. at 1223-24. Again, Carmichael refused to accept Feaga's offer to proffer for the chance of a reduced sentence, even after he had been tried and convicted by a jury. Similar to the situation presented in Osley, because Carmichael was unwilling to

22

accept a plea deal after he was convicted, incarcerated, and awaiting his sentencing, he cannot show that he would have accepted essentially the same deal prior to his conviction.

Carmichael's position that he would not proffer unless and until he was promised a guaranteed sentence simply ignores the realisms of how pleas and cooperation work in the real world. Plea negotiations represent a critical stage of criminal proceedings. The vast majority of cases result in a plea, so pleas are "not some adjunct to the criminal justice system; [they are] the criminal justice system." Frye, 566 U.S. at 143. And, at least in some cases, a cooperation provision is the cornerstone of the parties' plea agreement. As with any other contract, the parties must reach a meeting of the minds on this material part of their agreement. The government does not offer a deal to a defendant based on some metaphysical, undefined agreement to cooperate.

Before the government will commit to making a recommendation of a particular sentence, it must first understand what cooperation a defendant is willing and able to provide. For example, it must confirm that a defendant has assistance that he can provide that rises to a "substantial" level. See U.S. Sentencing Guidelines Manual § 5K1.1 (2018) ("Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense the court may depart

from the guidelines."). Eventually, if a § 5K1.1 motion is filed, the sentencing

court will be called upon to assess whether a defendant has in fact provided

substantial assistance. [9] Id. The policy statement found at § 5K1.1 lists five factors

the court may consider in determining the "appropriate reduction": (1) "the

significance and usefulness of the defendant's assistance;" (2) "the truthfulness,

completeness, and reliability of any information or testimony provided by the

defendant;" (3) "the nature and extent of the defendant's assistance;" (4) "any

injury suffered [or risk thereof] . . . resulting from his assistance;" and (5) "the

timeliness of the defendant's assistance." Id. So, the process begins with the

government taking steps to determine whether to present a deal to a defendant.

And, at least part of that calculus involves the government seeking to ensure that a

defendant is actually willing and able to cooperate to a level that qualifies for a §

5K1.1 departure.

All of this demonstrates a fundamental truism: a defendant cannot just

volunteer to cooperate. He must first (among other things) disclose to the

prosecution what information he actually has. That disclosure is typically done in a

proffer session. "The term 'proffer session' is generally applied to those interviews

---

[9] To be clear, in Wade v. United States, the Supreme Court held that sentencing courts may make a substantial assistance departure only on a motion by the government and that courts may review the government's refusal to bring a substantial assistance motion only if the government's refusal is based on a constitutionally impermissible motive. 504 U.S. 181, 184-86 (1992).

in which a defendant submits to questioning by prosecutors in the hope of receiving a benefit from the government, such as a decision to offer a defendant a cooperation agreement . . . ." U.S. v. Chaparro, 181 F. Supp. 2d 323, 326 n.2 (S.D.N.Y. 2002). Usually, before such a session even commences, a defendant will be required to sign a proffer agreement,[10] in which he agrees to truthfully furnish the government with helpful information and answer its questions. The information provided by a defendant in a proffer session allows the government to make appropriate prosecutorial decisions, including whether to make a plea offer, and, if so, what offer to make. If a proffering defendant does not have useful information, or if the government concludes that he is unwilling or unable to provide truthful information, there will be no plea offer based upon cooperation. The point is as tautological as it is true: before a defendant proffers, the government cannot possibly determine whether it will offer a plea deal, much less what sentence it will recommend to the sentencing court based upon his cooperation.

To be clear, the proffer session is a gateway into (not the capstone of) the parties' cooperation discussions. At the end of the proffer session, the government may have a better idea about whether it will continue to explore a plea deal with a defendant. But, even at that point, it will not always know whether it will actually offer a plea deal and what the precise terms of any deal may be. Any § 5K1.1

---

[10] See Kastigar v. United States, 406 U.S. 441 (1972).

25

motion for departure must be filed with the sentencing court and the government must be in a position to explain to the court the basis for the motion. A number of factors may inform the government's judgment about whether to file a motion for a departure, including: What information has been provided and to whom does it relate? Is the cooperating defendant truthful? Is he credible? Does he appear to have a good memory? Can the information he has provided be authenticated? Is it actionable and useful? Does the defendant have personal knowledge about the information and is he otherwise competent to testify about it? Is the information outdated (i.e., is it stale; has it already been supplied to the government)? Does the information relate to an individual who committed a federal offense (and, if not, is the information of such value to justify a departure for cooperation related to a state offense)? Is the defendant willing to interact with the targets of an investigation (e.g., make calls, meet, or wear a wire)? Will the defendant actually be able to do what he has agreed to do? Will he truthfully testify at a hearing and at trial?[11] So, even if Carmichael had been willing to proffer, and even if he had actually done so, there are a number of considerations that would affect whether he received a sentencing departure and the scope of any such departure.

---

[11] In some cases, the parties or the government request a continuance of the sentencing hearing so that the defendant will have the opportunity to perform tasks like this in order to complete the process of cooperation.

A major takeaway from all of this is that even a basic understanding of the cooperation process makes clear that Carmichael cannot simply incant that he would have been willing to cooperate and enter a guilty plea in order to receive ten years. The reality is that, even if he had been willing to proffer (and, to be clear, he was unwilling to do so, absent a guarantee on the front end), there is nothing to suggest that his participation in a proffer session would have successfully convinced the government to offer him a particular cooperation deal.

Carmichael's position on this issue is a non-starter. He was unwilling to sit for a proffer (even after his conviction) unless he was guaranteed a specific sentence. It follows that he is in no position to say that he could have offered such substantial assistance—much less "super cooperation"—to qualify for a certain sentencing recommendation. On this record, Carmichael has fallen far short of showing a reasonable probability that, but for counsels' unprofessional errors, he would have earned a ten-year deal.[12]

---

[12] Further, Carmichael's claim that he would have taken the ten-year deal (or, for that matter, the twenty-year deal) is partially undercut by his repeated claims of innocence. Osley, 751 F.3d at 1224 (noting that although a petitioner's "denial of guilt surely is not dispositive on the question of whether he would have accepted the government's plea offer, it is nonetheless a relevant consideration.") (citations omitted). We understand that criminal defendants sometimes (if not often) claim innocence and at the same time wish to explore a plea deal. But, Carmichael's repeated insistence that he was innocent certainly does not aid him in establishing a claim that he would have taken any deal offered by the government.

27

B.    The Twenty-Year Proposal

The district court noted that "[r]egarding the [twenty]-year proposal, Carmichael's failure to show prejudice is starker." The twenty-year proposal contemplated that Carmichael would not have been required to provide super cooperation. Rather, he was merely required to provide substantial assistance, i.e., "useful information."

Carmichael claims he would have accepted the twenty-year offer if he knew he was facing 360-months to life in prison. But, aside from his own conclusory statements and self-serving protestations at the evidentiary hearing, Carmichael did not offer any testimony or evidence indicating that he would have actually accepted an offer that required him to serve a twenty-year sentence. Again, there are strong indications in the record that he would not have.

At the evidentiary hearing, Feaga testified that, even after Carmichael was found guilty and he (Feaga) apprised Carmichael of the serious sentence he was facing, Carmichael did not accept the twenty-year proposal when it was offered. Instead, Carmichael told Feaga that he would take his chances on appeal. After his meeting with Feaga, and while thinking about whether he should have accepted Feaga's offer, Carmichael may have had second thoughts. He asked three of his attorneys whether he should have accepted the twenty-year proposal. James and Jenkins agreed with his decision to reject the proposal for varying reasons (his age

28

and the view that Judge Thompson would not likely impose a sentence greater than twenty-years in any event).[13] They confirmed Carmichael's inclination, and what he actually told Feaga—that he should take his chances on appeal. Chartoff was the only lawyer to advise Carmichael to accept Feaga's proposal. After hearing from his lawyers, Carmichael again (at least initially) stayed the course. He made no effort to accept or discuss the offer. Instead, he waited over two months, and then apparently had third thoughts. Only then did he ask Chartoff to help him hire yet another attorney to negotiate a deal with Feaga. By that time, though, it was too late: the twenty-year deal had been pulled off the table.

Based on these facts, we are hard-pressed to conclude the district court erred in finding that Carmichael would not have taken a twenty-year deal before he was convicted, even if he had been fully informed about his potential guideline range.

C.    Carmichael's Belated Assertion of Post-Trial Ineffective Assistance

To be clear, our inquiry today is limited to the issue of prejudice regarding Carmichael's counsels' pre-trial performance. The district court clearly found that counsels' performance post-trial was not deficient, and thus, did not reach Strickland's prejudice prong on this issue. Additionally, Carmichael did not raise

---

[13] Carmichael's counsel argues that James and Jenkins advised Carmichael to reject the plea deal and that their advice was constitutionally deficient. But we think a better interpretation of the record evidence is that Carmichael rejected the Feaga offer, and sought advice after the fact from his counsel about whether he had made the right decision.

this issue on appeal in his briefing. United States v. Wright, 607 F.3d 708, 713

(11th Cir. 2010) (reiterating the long standing rule that "issues not raised in the

initial appellate brief are deemed abandoned on appeal."). Despite that failure, at

oral argument Carmichael's counsel pressed the claim that there was post-trial

ineffective assistance. In response, the government made it clear it does not

concede any such error and further pointed out that the record does not support it.

We agree.

The only ineffective assistance that Carmichael's attorney contends occurred

after the trial was Carmichael's counsels' advice to decline Feaga's twenty-year

offer.[14] This offer occurred during a conversation between Carmichael and Feaga

at the Elmore County Jail. During the conversation, Feaga suggested that, with

cooperation, Carmichael might limit his sentence to twenty-years. When

Carmichael asked his attorneys for advice, James and Jenkins advised Carmichael

not to take the deal. The district court explicitly found that "[t]here is no evidence

---

[14] For the sake of clarity, we note that there were two post-trial conversations regarding potential plea offers. The first conversation took place between Carmichael, James, Feaga, and Franklin on the Monday after the jury returned its verdict. At this meeting, Franklin suggested that the prosecution might work out a deal limiting Carmichael's sentence to twenty-years, if Carmichael cooperated. But Carmichael demanded a guaranteed sentence before he cooperated with the government. Franklin explained to Carmichael, "that's just not the way it works." We think it is crystal clear that the district court found that Carmichael himself rejected the government's offer to enter into an agreement that would limit his sentence to twenty-years. The district court did not find that Carmichael's counsels' performance, in this respect, was deficient in any way. The second conversation occurred when Carmichael met alone with Feaga at the Elmore County Jail and is detailed above. There, Carmichael told Feaga he would take his chances on appeal.

that the advice of James and Jenkins to reject the twenty-year post-verdict offer was objectively unreasonable." Specifically, the district court found:

> James and Jenkins were wrong in their advice that the twenty-year offer was not in Carmichael's best interest. But it is difficult to gainsay the advice. No evidence was presented establishing that counsel's prediction of a sentence was unreasonable. Nor was there evidence why counsel believed Carmichael had a chance to prevail on appeal.

We agree. For the reasons we have already discussed, Carmichael cannot show that any post-trial conduct of his lawyers was ineffective. Again, Feaga's proposal was made directly to Carmichael; Carmichael required a commitment to a particular sentence before he would proffer; and absent that, Carmichael was willing to take his chances at sentencing. The fact that two of his three lawyers agreed with his decision does not render their advice unreasonable. So, even if Carmichael had preserved this argument in his briefing, it fails on the merits.

D.    Carmichael's Argument that the District Court Failed to Examine the Totality of Counsels' Deficient Performance

Finally, Carmichael argues that had the district court considered the totality of the circumstances, it would have found that his lawyers' performance prejudiced him. In support, he notes that his counsel failed to notify him of plea discussions, never advised him of his guideline range, did not pursue plea negotiations prior to trial, and were woefully unprepared for trial. He contends that when each of these failures is combined with the fact that his lawyers did not inform him of the

31

government's ten/twenty-year proposal, the district court should have found there is a reasonable probability that he would have accepted the government's offer. First, we are not convinced that the district court failed to consider each of these facts. Second, these were not the only facts before the district court when it made its findings, and those are not the only facts in the record before us.

The district court also assessed, among other things: Carmichael's repeated claims of innocence; Carmichael's refusal to proffer without a promise of a guaranteed sentence; Carmichael's failure to present evidence that he could have (or would have) provided super cooperation; and Carmichael's failure to accept a twenty-year offer even after he was apprised of his sentencing exposure. Thus, while the district court did not expressly reference the phrase "totality of the circumstances," we are confident that the court considered all of these circumstances, made the correct findings,[15] and reached the correct conclusion.

IV.    Conclusion

After careful review, we conclude the district court did not err in concluding that Carmichael has not shown he was prejudiced by his counsels' failures. Because Carmichael has failed to establish that, but for counsels' unprofessional errors, the result of his criminal proceedings would have been different, we affirm.

---

[15] At oral argument, Carmichael's counsel conceded that there is no claim in this case that any of the district court's findings were clearly erroneous. See Fed. R. Civ. P. 52(a).

32

AFFIRMED.